**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, §<br><br>§<br>*Plaintiff*, §<br><br>§<br>v. §<br><br>§<br>U.S. DEPARTMENT OF THE §<br>INTERIOR; U.S. FISH AND WILDLIFE §<br>SERVICE; DEBRA HAALAND, in her §<br>official capacity as SECRETARY OF THE §<br>INTERIOR; and MARTHA WILLIAMS, §<br>in her official capacity as DIRECTOR OF §<br>THE U.S. FISH AND WILDLIFE §<br>SERVICE, §<br><br>§<br>*Defendants*. §| Civil Action No. <u>6:24-cv-81</u> |

**COMPLAINT AND PETITION FOR REVIEW**

Plaintiff, the State of Texas ("Texas" or "Plaintiff"), files this Complaint against the United States Department of the Interior, the United States Fish and Wildlife Service, Debra Haaland, in her official capacity as Secretary of the Interior, and Martha Williams, in her official capacity as Director of the United States Fish and Wildlife Service, for violations of the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA") in listing seven species of freshwater mussels ("Central Texas Mussels") as threatened or endangered. Plaintiff alleges as follows:

**INTRODUCTION**

1. This is an action challenging the legality of the final administrative rule entitled "Endangered and Threatened Wildlife and Plants; Endangered Species Status With Critical Habitat for Guadalupe Fatmucket, Texas Fatmucket, Guadalupe Orb, Texas Pimpleback, Balcones

Spike, and False Spike, and Threatened Species Status With Section 4(d) Rule and Critical Habitat for Texas Fawnsfoot" ("Final Rule" or "Rule"), promulgated by the defendant U.S. Fish and Wildlife Service ("Service"). The Final Rule was published in the Federal Register at 89 Fed. Reg. 48,034 on June 4, 2024. A true and correct copy of the Rule is attached hereto as **Exhibit 1**. Prior to adopting the Final Rule, the Service published a notice of proposed rulemaking in the Federal Register at 86 Fed. Reg. 47,916 on August 26, 2021 ("Proposed Rule"). A true and correct copy of the Proposed Rule is attached hereto as **Exhibit 2**.

2.    The Final Rule lists the Central Texas Mussels as threatened or endangered, promulgates a Section 4(d) regulation to protect the threatened species, and establishes a critical habitat for all seven species. Each portion of the Rule suffers from legal and procedural defects that call into question the Final Rule's legality.

3.    In making its final listing determination, the Service committed several errors. The Service violated the ESA and its own policies by failing to recognize and give consideration owed to Texas's comprehensive statutory, regulatory, and programmatic conservation efforts to protect the Central Texas Mussels. The Service also failed to provide sufficient specificity in describing what may or may not result in a take of the Central Texas Mussels. And the Service's final listing determination is procedurally deficient because the determination was published nearly three years after the Proposed Rule—well in excess of the one-year publication deadline established by the ESA.

4.    The Service's Section 4(d) regulation suffers from the same vagueness that plagues the final listing determination, making it nearly impossible for the public to understand what the

Rule prohibits. Furthermore, the Service refused to conduct an environmental analysis or provide an environmental impact statement as is required by NEPA.

5. The critical habitat designation for the Central Texas Mussels also contains numerous deficiencies. The Service violated the ESA by failing to make the designation on the basis of the best available scientific data and to consider the full economic impacts that such a designation will impose. Like the Service's final listing determination, the critical habitat designation was also published in an untimely manner in violation of the ESA's clear requirements. The Rule's critical habitat designation was also published without providing notice and an opportunity to comment on the applicability of the Service's revised definition of "habitat," as required by the APA.

6. The Central Texas Mussels have been—and continue to be—protected by Texas law. Furthermore, Texas has worked closely with private property owners and industry partners to ensure the continued conservation, management, and protection of the species. The ability to manage wildlife resources at the state level is especially important in a state like Texas where rivers and riverbeds are state-owned and most land is privately owned. These local efforts, balanced with ongoing economic development, are crucial to protecting the Central Texas Mussels. The Final Rule threatens to derail these efforts. Because it violates the APA, ESA, and NEPA, the Rule must be vacated.

## PARTIES

### A. Plaintiff

7. Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the State and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; *see also* Tex. Gov't Code ch. 402.

8.      The Final Rule harms Texas by infringing on Texas's sovereign interests. Texas has a robust statutory and regulatory scheme to regulate wildlife, including provisions to recognize species as threatened or endangered and to provide enhanced protections for such species. *See, e.g.*, Tex. Parks & Wild. Code ch. 67 & 68; 31 Tex. Admin. Code ch. 65, subch. G. Texas also has robust protections for all types of mussels located within the state. *See, e.g.*, Tex. Parks & Wild. Code ch. 78, subch. A; 31 Tex. Admin. Code ch. 57, subch. B. Furthermore, Texas maintains numerous programs aimed at enhancing conservation of wildlife and wildlife resources through partnerships with private landowners. *See* Final Rule, 89 Fed. Reg. at 48,059.

9.      The Final Rule further harms Texas by imposing unnecessary regulatory burdens. For example, the Texas Commission on Environmental Quality ("TCEQ") maintains the authority to permit discharges to surface waters in the State. Tex. Water Code § 26.027(a). TCEQ anticipates that the Final Rule will increase the time and effort spent in reviewing and approving permits issued under the Texas Pollutant Discharge Elimination System. *See* Unsworn Decl. of Jill Csekitz ¶ 6 (attached hereto as **Exhibit 3** and incorporated by reference). Additionally, the Texas Department of Transportation ("TxDOT") anticipates increased compliance costs to address the Final Rule's requirements associated with transportation projects within Texas. *See* Unsworn Decl. of Doug Booher, ¶ 7 (attached hereto as **Exhibit 4** and incorporated by reference). These are resources that, if not for the Final Rule, Texas could use elsewhere.

**B.      Defendants**

10.     Defendant United States Department of the Interior ("Interior" or "Department") is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). The Department is charged with administering the ESA, 16 U.S.C. §§ 1531–1544.

11.     Defendant United States Fish and Wildlife Service is a federal agency within the meaning. *See* 5 U.S.C. § 551(1). The Service is an agency within the Interior. The Secretary of the Interior has delegated the implementation of the ESA, including listing decisions, to the Service.

12.     Defendant Debra Haaland is the Secretary of the Interior and is sued in her official capacity. Secretary Haaland, in her capacity as Secretary of the Interior, is ultimately responsible for the Service's actions under the ESA.

13.     Defendant Martha Williams is the Director of the Service and is sued in her official capacity. Director Williams, in her capacity as Director of the Service, is responsible for the Service's actions under the ESA.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(g) (Endangered Species Act), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act). There is a present and actual controversy between the parties, and Plaintiff is challenging a final agency action pursuant to 5 U.S.C. §§ 551(13) and 704. This Court can grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

15.     Venue is proper in this Court under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff and its agencies are residents of this judicial district; and (2) the Central Texas Mussels and their current and historical range and occupied range are located in this district.

16.     On August 27, 2024, Texas notified the Service in writing by e-mail and certified mail of its intent to file this suit if the Service did not correct the deficiencies in the Final Rule. The Service did not address the issues identified in Texas's letter within 60 days. A copy of this notice is attached hereto as **Exhibit 5**.

## LEGAL FRAMEWORK

### The Endangered Species Act

17. The purpose of the ESA is "to provide means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

### A. Listing a Species as Threatened or Endangered

18. Before a species receives protection under the ESA, it must be listed as "threatened" or "endangered." A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20). An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).

19. The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

20. A species may be listed as endangered or threatened if any one or a combination of the following factors are present:

> (A)   the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B)   overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C)   disease or predation;
>
> (D)   the inadequacy of existing regulatory mechanisms; or,
>
> (E)   other natural or manmade factors affecting its continued existence.

*Id*. § 1533(a)(1).

6

21.     A determination to list a species must be based on the "best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

22.     For each listing determination, the Service must publish in the Federal Register a summary of the data on which the listing determination is based and show the relationship of the data to the determination. *Id.* § 1533(b)(8).

**B.     Evaluation of Conservation Efforts in Listing Decisions**

23.     The ESA requires the Service to consider any conservation efforts, such as protection of habitat and food supply, being made by States or political subdivisions to protect a species. *Id.* § 1533(b)(1)(A); *see also* 50 C.F.R. § 424.11(g). To ensure consistent and adequate consideration of such efforts, the Service has issued a formal policy when making listing decisions under the ESA. *See generally* Policy for Evaluation of Conservation Efforts When Making Listing Decisions, 68 Fed. Reg. 15,100 (Mar. 28, 2003) (codified at 50 C.F.R. ch. IV) ("PECE"). The PECE "identifies the criteria [the Service] will use to help determine the certainty of implementation and effectiveness" of formalized conservation efforts.[1] *Id.* at 15,113.

24.     The PECE identifies two key factors for evaluating whether certain conservation efforts improve the status of species under the ESA: "(1) for those efforts yet to be implemented, the certainty that the conservation effort will be implemented and (2) for those efforts that have not yet demonstrated effectiveness, the certainty that the conservation effort will be effective." *Id.* at 15,114.

---

[1] The term "formalized conservation efforts" is defined to include "conservation efforts identified in a conservation agreement, conservation plan, management plan, or similar document." PECE, 68 Fed. Reg. at 15,113. These agreements, plans, and documents are contemplated to be approved by Federal agencies, State and local governments, Tribal governments, businesses, organizations, or individuals. *Id.* at 15,112.

25.     The PECE directs the Service to determine the "certainty that the conservation effort will be implemented" based on nine criteria. *Id.* at 15,114–15. These include:

(1)     The conservation effort, the party(ies) to the agreement or plan that will implement the effort, and the staffing, funding, level, funding source, and other resources necessary to implement the effort are identified.

(2)     The legal authority of the party(ies) to the agreement or plan to implement the formalized conservation effort, and the commitment to proceed with the conservation effort are described.

(3)     The legal procedural requirements (e.g. environmental review) necessary to implement the effort are described, and information is provided indicating that fulfillment of these requirements does not preclude commitment to the effort.

(4)     Authorizations (e.g., permits, landowner permission) necessary to implement the conservation effort are identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the effort will obtain these authorizations.

(5)     The type and level of voluntary participation (e.g., number of landowners allowing entry to their land, or number of participants agreeing to change timber management practices and acreage involved) necessary to implement the conservation effort is identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain that level of voluntary participation (e.g., an explanation of how incentives to be provided will result in the necessary level of voluntary participation).

(6)     Regulatory mechanisms (e.g., laws, regulations, ordinances) necessary to implement the conservation effort are in place.

(7)     A high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain the necessary funding.

(8)     An implementation schedule (including incremental completion dates) for the conservation effort is provided.

(9)    The conservation agreement or plan that includes the conservation effort is approved by all parties to the agreement or plan.

*Id.*

26.    The PECE also directs the Service to determine the "certainty that the conservation effort will be effective" based on six criteria. *Id.* at 15,115. These include:

(1)    The nature and extent of threats being addressed by the conservation effort are described, and how the conservation effort reduces the threats is described.

(2)    Explicit incremental objectives for the conservation effort and dates for achieving them are stated.

(3)    The steps necessary to implement the conservation effort are identified in detail.

(4)    Quantifiable, scientifically valid parameters that will demonstrate achievement of objectives, and standards for these parameters by which progress will be measured, are identified.

(5)    Provisions for monitoring and reporting progress on implementation (based on compliance with the implementation schedule) and effectiveness (based on evaluation of quantifiable parameters) of the conservation effort are provided.

(6)    Principles of adaptive management are incorporated.

*Id.*

27.    Although the PECE applies only to formalized conservation efforts, the PECE makes clear that the ESA and the Service's regulations that implement the ESA require the Service "to take into account *any* State or local laws, regulations, ordinances, programs, or other specific conservation measures that either positively or negatively affect a species' status." *Id.* at 15,113 (emphasis added).

9

**C.     Consequences of Listing a Species and 4(d) Rules**

28.     "Endangered" species are protected by Section 9 of the ESA, which, among other things, makes it unlawful for any person to "take" such a species. *See* 16 U.S.C. 1538(a)(1)(B).

29.     The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). "Harm" is defined to include significant habitat modification or degradation if it results in the death or injury to a listed species by significantly impairing essential behavior patterns including breeding, feeding, or sheltering. 50 C.F.R. § 17.3. According to the Service, "[t]ake can result knowingly or otherwise, by direct and indirect impacts, intentionally or incidentally." Final Rule, 89 Fed. Reg. at 48,065.

30.     Depending on the needs of an individual species, the "take" prohibition can mean an outright prohibition or significant limitation on certain activities in spaces that contain habitat for the species. For example, farming, oil and natural gas drilling, flood control management, grazing livestock, or other activities may be prohibited if they modify existing habitat or "harass" the species in some way. "Harass" is defined as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

31.     While wildlife listed as endangered are automatically afforded protections under Section 9 of the ESA, wildlife listed as threatened are not automatically afforded these same protections. *See id*. § 17.31. Instead, if the Service decides to provide protections for a threatened species, it can do so by promulgating a "4(d) rule." Section 4(d) of the ESA allows the Service to promulgate regulations that are "necessary and advisable to provide for the conservation of

[threatened] species." 16 U.S.C. § 1533(d). These species-specific 4(d) rules allow for tailored protections that are "necessary and advisable" to protect a threatened species. A 4(d) rule is typically finalized with the listing of the species. *See* Endangered and Threatened Wildlife and Plants; Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753, 44,755 (Aug. 27, 2019) (codified at 50 C.F.R. pt. 17).

**D.    Designation of Critical Habitat**

32.    At the time a species is listed as threatened or endangered, the Service is required "to the maximum extent prudent and determinable . . . designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).

33.    The term "critical habitat" is defined to include:

(i)    the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protections; and

(ii)    specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the [Service] that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A). Except as determined by the Service, the term "critical habitat" does not "include the entire geographical area which can be occupied by the threatened or endangered species." *Id.* § 1532(5)(C). Ultimately, however, "'critical habitat' must also be 'habitat.'" *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 19 (2018).

34.    When the Service designates critical habitat, it must do so "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The Service may exclude an area from its critical habitat

11

designation if "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.* An area may not be excluded if the Service determines "based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id.*

### E.    Procedures for Promulgating ESA Regulations

35.    The Service is generally required to abide by the APA's rulemaking procedures when carrying out its obligations under the ESA. *Id.* § 1533(b)(4). The only identified exceptions to this requirement relate to the timing of listings in the Federal Register and emergency situations. *Id.* § 1533(b)(4), (7).

36.    For proposed regulations, the Service is required to publish general notice in the Federal Register no later than 90 days prior to the effective date of the regulation. *Id.* § 1533(b)(5)(A)(i). Additionally, the Service is to "give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency[2] in each State in which the species is believed to occur, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction thereon." *Id.* § 1533(b)(5)(A)(ii). The Service is also required to "publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur" and hold a public hearing within 45 days of publication in the Federal Register, if requested. *Id.* § 1533(b)(5)(D)–(E).

---

[2] "State agency" is defined to mean "any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State." 16 U.S.C. § 1532(18).

37.     The Service is required to timely publish final decisions in the Federal Register. For final listing determinations, the Service must publish in the Federal Register, no later than one year after the publication of the general notice, either a final regulation to implement its determination, notice that the one-year period is being extended, or notice that the proposed regulation is being withdrawn together with the finding on which such withdrawal is based. *Id*. § 1533(b)(6)(A)(i)(I), (III)–(IV). Similarly, for final designations of critical habitat, the Service must publish, no later than one year after the publication of the general notice, either a final regulation to implement its designation or notice that the one-year period is extended. *Id*. § 1533(b)(6)(A)(ii), (C)(ii).

38.     The ESA only permits an extension of the deadline to publish final regulations in limited circumstances. For final listing determinations, the Service may extend the one-year period by six months to solicit additional data only if the Service determines "that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." *Id*. § 1533(b)(6)(B)(i). The Service must then publish either a final regulation implementing its final determination, a finding that the listing should not be made, or withdraw the proposed regulation. *Id*. § 1533(b)(6)(B)(iii). For critical habitat designations, the Service may extend the publication of its final determination by one year only if critical habitat is "not then determinable." *Id*. § 1533(b)(6)(C)(ii). The Service must then "publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." *Id*.

39.     If the Service fails to issue a final listing regulation because it deems there is not sufficient evidence to support a listing, then, upon the expiration of either the one-year period or

13

the six-month extension period, the Service must withdraw its proposed regulation. *Id*. § 1533(b)(6)(B)(ii). The Service may not propose a new listing regulation unless it first determines that "sufficient new information is available to warrant such proposal." *Id*.

## The Administrative Procedure Act

40.     The APA governs the federal rulemaking process and sets the standards applicable when federal agencies propose and adopt final rules and regulations. 5 U.S.C. §§ 551(4), 553.

41.     Agencies must provide general notice of a proposed rule in the Federal Register that contains, among other things, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b)(3). Once notice is provided, agencies "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c). Proposed rules are "not required to specifically identify every precise proposal which the agency may ultimately adopt as a final rule." *Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023) (quoting *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989)). The agency's final rule, however, "must be a logical outgrowth of the rule proposed." *Id*. (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)). To be a logical outgrowth, a final rule must be such that "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id*. (internal quotations omitted). "If the logical-outgrowth requirement is not satisfied, a court must set aside the agency action found to be 'without observance of procedure required by law.'" *Id*. (quoting 5 U.S.C. § 706(2)(D)).

42.     The APA provides for judicial review of final agency actions by persons adversely affected by such actions. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A). A final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

43.     A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### The National Environmental Policy Act

44.     The purpose of NEPA, 42 U.S.C. §§ 4321–4370m-11, is to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a) (2020).[3] "The purpose and function of NEPA are satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the

---

[3] The Council on Environmental Quality ("CEQ") updated its regulations administering NEPA effective July 1, 2024. Because the Final Rule was published before these updates, all reference to CEQ's regulations in this Complaint shall be to the pre-2024 amendments.

decision-making process." *Id.* NEPA regulations are binding on all federal agencies. *Id.* § 1500.3(a) (2020).

45.    NEPA requires federal agencies to prepare and circulate for public comment a detailed environmental impact statement prior to undertaking any major federal action that may significantly affect the environment. *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1500.1(b) (2020). Major federal actions include "new or revised agency rules, regulations, plans, policies, or procedures" and the "[a]doption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act." 40 C.F.R. § 1508.1(q)(2), (3)(i) (2022).

46.    When a federal agency is unsure whether an environmental impact statement is required,[4] the agency is directed to prepare an environmental assessment that "provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Id.* § 1501.5(c)(1) (2020). If the agency determines during the environmental assessment that the "proposed action will not have significant effects[,]" the agency must prepare a "finding of no significant impact." *Id.* § 1501.6(a) (2020).

## BACKGROUND

**A.    The Central Texas Mussels and Their Habitat**

47.    The Guadalupe fatmucket (*Lampsilis bergmanni*) is a small- to medium-sized mussel that grows up to 4 inches in length with a yellow-green shell that is similar in appearance to the Texas fatmucket. Final Rule, 89 Fed. Reg. at 48,043. Because of its recent discovery, little is known about the Guadalupe fatmucket but it is expected to share many of the same life cycle characteristics and habitat needs as the Texas fatmucket. *Id.* The Guadalupe fatmucket is known to be located in a

---

[4] *See* 40 C.F.R. § 1501.5(a) ("An agency shall prepare an environmental assessment . . . when the significance of the effects is unknown[.]").

52-mile stretch of the Guadalupe River and two of its tributaries—the North Fork Guadalupe River and Johnson Creek—in Kendall and Kerr Counties. *Id.*

48. The Texas fatmucket (*Lampsilis bracteata*) is a small- to medium-sized mussel that grows up to 4 inches in length with a yellow-green-tan shell. *Id.* The Texas fatmucket uses host fish such as bluegill, green sunfish, Guadalupe bass, and largemouth bass for reproduction purposes throughout their range. *Id.* The Texas fatmucket has an estimated life span of 13 to 25 years. *Id.* at 48,044. Habitat for the Texas fatmucket consists of firm mud, stable sand, and gravel bottoms, shallow waters, with features such as fissures or rooted aquatic vegetation. *Id.* The Texas fatmucket are typically found in free-flowing rivers but may also survive in areas of impounded water. *Id.* Known populations of the Texas fatmucket are located throughout the Colorado River Basin throughout Blanco, Gillespie, Hays, Kimble, Llano, Mason, McCulloch, Menard, Runnels, San Saba, and Travis Counties, including the Lower Elm Creek, the San Saba River, the Llano River, the Pedernales River, and Onion Creek. *Id.*

49. The Guadalupe orb (*Cyclonaias necki*) is a small-sized mussel that grows up to 2.5 inches that, although morphologically similar to the Texas pimpleback, are thinner and more compressed with slight differences in shell patterns. *Id.* at 48,045. The Guadalupe orb uses catfishes such as the channel catfish, flathead catfish, and tadpole madtom as host fish for reproductive purposes. *Id.* The Guadalupe orb shares many of the same reproduction, ecological interactions, and habitat requirements with the Texas pimpleback due to the close relation of the two species. *Id.* The Guadalupe orb is known to be present in the upper Guadalupe River in Comal, Kendall, and Kerr Counties, and the lower Guadalupe River in Caldwell, DeWitt, Gonzales, Guadalupe, and Victoria Counties. *Id.*

50.    The Texas pimpleback (*Cyclonaias petrina*) is a small- to medium-sized mussel that grows up to 4 inches with a yellow, brown, or black shell with occasional green rays or blotches. *Id*. The Texas pimpleback uses catfish for reproductive purposes between April and August and is estimated to live up to 72 years. *Id*. Known populations of the Texas pimpleback are throughout the Colorado River Basin in Brown, Concho, Coleman, Colorado, Mason, McCulloch, Menard, Mills, San Saba, and Wharton Counties, including the Colorado River, the Concho River, the Llano River, and the San Saba River. *Id*. at 48,045–46.

51.    The Balcones spike (*Fusconaia iheringi*) is a small- to medium-sized mussel that grows up to 3.8 inches with a yellow-green or brown elongate shell with similar morphology as the closely related false spike. *Id*. at 48,046. Data on the Balcones spike is limited due to its recent discovery; however, the Balcones spike is believed to have similar habitat needs, host fish, and reproductive habits as the false spike. *Id*. Known populations of the Balcones spike are located within the Brazos and Colorado River Basins in Mason, Milam, San Saba, and Williamson Counties, including Brushy Creek, the Little River, the Llano River, the San Gabriel River, and the San Saba River. *Id*.

52.    The false spike (*Fusconaia mitchelli*), once believed to be extinct, is a medium-sized mussel that grows up to 5.2 inches with a yellow-green, brown, or black elongate shell. *Id*. at 48,047. The false spike relies upon minnows such as the blacktail shiner and red shiner as host fish for reproduction and have an estimated maximum age of 15 years. *Id*. Habitats for the false spike include slow to moderate flowing bodies of water such as large creeks and rivers with sand, gravel, or cobble substrates. *Id*. The only known population of the false spike is located within a 102-mile stretch of the lower Guadalupe River in DeWitt, Gonzales, and Victoria Counties. *Id*.

53.     The Texas fawnsfoot (*Truncilla macrodon*) is a small- to medium-sized mussel that grows up to 2.4 inches with an elongated shell. *Id*. at 48,044. The Texas fawnsfoot is assumed to use freshwater drum as a host fish for reproduction and has an estimated maximum age of 8 to 18 years. *Id*. The Texas fawnsfoot is found in medium- to large-sized streams and rivers that have flowing water and substrates consisting of mud, sand, or gravel. *Id*. Adult mussels are most frequently found on banks and occasionally in backwater habitats with low to moderate water flows. *Id*. Known populations of the Texas fawnsfoot are located throughout the Trinity, Brazos, and Colorado River Basins in Anderson, Austin, Brazos, Burleson, Colorado, Falls, Fort Bend, Grimes, Houston, Kauffman, Leon, Madison, Matagorda, McLennan, Milam, Mills, Navarro, Palo Pinto, Parker, Robertson, San Saba, Shackelford, Throckmorton, Waller, Washington, and Wharton Counties, including the Clear Fork Brazos River, the Brazos River, the Colorado River, the San Saba River, the East Fork Trinity River, and the Trinity River. *Id*. at 48,044–45.

54.     Freshwater mussels, including the Central Texas Mussels, are frequently found in groups known as mussel beds that range in size between 50 to 5,000 square meters. *Id*. at 48,048. The Service considers a mussel population to consist of a "collection of mussel beds within a stream reach between which infested host fish may travel." *Id*.

55.     The Service has identified several physical or biological features ("PBFs") that are necessary for the conservation of the Central Texas Mussels *Id*. at 48,069. Although the PBFs may vary from species to species, they generally include (1) "[s]uitable substrates and connected instream habitats, characterized by geomorphically stable stream channels and banks," (2) "[a]dequate flows, or a hydrologic flow regime, necessary to maintain benthic habitats," (3) "[w]ater and sediment quality . . . necessary to sustain natural physiological processes for normal

behavior, growth, and viability of all life stages," and (4) "[t]he presence and abundance of fish hosts necessary for the recruitment" of the Central Texas Mussels. *Id.*

### B.    The Ongoing Efforts to Conserve the Central Texas Mussels

56.    Texas maintains a robust statutory and regulatory scheme intended to protect and preserve fish and wildlife resources. The Texas Parks and Wildlife Department ("TPWD") is authorized to regulate "the taking, possession, purchase, and sale" of mussels. Tex. Parks & Wild. Code § 78.006(a). TPWD is also required to "develop and administer management programs to insure the continued ability of nongame species of fish and wildlife to perpetuate themselves successfully" and to maintain a list of species "threatened with statewide extinction." *Id.* §§ 67.002(a), 68.003(a). Accordingly, TPWD has developed lists of species found within Texas that are deemed to be threatened or endangered. *See* 31 Tex. Admin. Code §§ 65.175 (threatened species), 65.176 (endangered species). TPWD's list of threatened species includes six of the seven Central Texas Mussels. *See* Unsworn Decl. of Timothy Birdsong ¶ 5 (attached hereto as **Exhibit 6** and incorporated by reference).

57.    Texas law prohibits the unauthorized taking of mussels of any kind. *See* Tex. Parks & Wild. Code § 78.002(a); 31 Tex. Admin. Code § 57.157(a). Similarly, "no person may take, possess, propagate, transport, import, export, sell, or offer for sale any species of fish or wildlife" listed as threatened. 31 Tex. Admin. Code § 65.171(b)(2); *see also id.* § 57.157(a)(2) (prohibiting the "take, possession, sale, or offering for sale of any species of mussel" that is listed as threatened or endangered). Violations of these prohibitions carry civil and criminal consequences. Any person who unlawfully "kills, catches, takes, possesses, or injures" a mussel is liable to Texas for the value of each mussel that is affected. Tex. Parks & Wild. Code § 12.301. Furthermore, it is a misdemeanor

20

for any person to violate the prohibitions related to mussels generally or prohibitions related to threatened species. *Id.* §§ 67.005, 78.007; 31 Tex. Admin. Code § 65.177(1).

58.     These statutory and regulatory protections are bolstered by programmatic approaches implemented by and including TPWD and TxDOT as well as voluntary land-use practices implemented on participating private and public lands found within relevant river basins.

59.     For example, TPWD manages multiple properties within the Brazos, Colorado, and Guadalupe River Basins. In doing so, TPWD is "committed to management of these properties consistent with watershed best management practices and sustainable recreational use strategies that benefit river ecosystem health." Comment Letter from TPWD to the Service, 1 (Oct. 25, 2021) (hereinafter "TPWD Comment Letter") (attached hereto as part of **Exhibit 7**); Birdsong Decl. ¶ 7. TPWD's Landowner Incentive Program ("LIP") engages private landowners to implement conservation practices aimed at improving watershed functions and habitat conditions for all species, including the Central Texas Mussels. TPWD Comment Letter 1; Birdsong Decl. ¶ 8. "Since 2007, LIP projects have directly improved habitat in over 10 miles of waterways and over 87,000 acres of watersheds" impacted by the Final Rule. TPWD Comment Letter 1; Birdsong Decl. ¶ 8. TPWD has also participated in the Texas Instream Flow Program and has led efforts to include the needs of the Central Texas Mussels "in the development of instream flow recommendations in the lower Brazos River basin and with ongoing work in the lower Guadalupe River that will also benefit proposed critical habitat." TPWD Comment Letter 2; Birdsong Decl. ¶ 17. Other efforts by TPWD include the joint development of mussel conservation plans with river authorities and fishery management and conservation to enhance the presence of host fish necessary to the Central Texas Mussels' continued survival. TPWD Comment Letter 2; Birdsong Decl. ¶¶ 11–13.

60.     TxDOT has been "actively engaged in freshwater mussel research and conservation including surveys and relocations at project sites" since the Central Texas Mussels were listed as threatened by TPWD in 2010. Comment Letter from TxDOT to the Service, 1 (Oct. 25, 2021) (hereinafter "TxDOT Comment Letter") (attached hereto as part of **Exhibit 7**). For example, TxDOT has invested $2.2 million into mussel research, including the development of Texas A&M University's Mussels of Texas Database that has "result[ed] in a comprehensive understanding of the past and current range and status of Texas mussels." Booher Decl. ¶ 4. Additionally, TxDOT conducts surveys where infrastructure improvements and maintenance interact with riparian habitats and relocate mussels that may be adversely impacted by such projects. *Id.* at ¶¶ 5–7. TxDOT shares the information gathered from these efforts with TPWD and the Mussels of Texas Database to expand the growing body of knowledge on the species. *Id.* at ¶ 6. Furthermore, TxDOT is developing a new survey method that will "minimize cost and risk to project delivery and human health while matching or increasing mussel detection efficiency rates when compared to" current methods. *Id.* at ¶ 8.

61.     Texas has also worked closely with private landowners and river authorities to implement voluntary protections for the Central Texas Mussels. For example, TPWD has worked with the Texas and Southwestern Cattle Raisers Association ("TSCRA") to restore "approximately 10,000 acres of upland habitats in priority watersheds for the conservation of aquatic wildlife resources." Comment Letter from TSCRA to the Service, 2 (Oct. 25, 2021) (hereinafter "TSCRA Comment Letter") (attached hereto as part of **Exhibit 8**). As the Service acknowledges, these voluntary efforts are important to conserve the Central Texas Mussels. *See, e.g.,* Final Rule, 89 Fed. Reg. at 48,091 ("The development and maintenance of effective working

partnerships with non-Federal partners for the conservation of at-risk species is particularly important in areas such as Texas, a State with relatively little Federal landownership but many species of conservation concern.").

### C.      The Service's Proposal to List the Mussels

62.      On June 25, 2007, the Service received a petition to list 475 species in the southwestern United States—including the Texas Fatmucket—as threatened or endangered under the ESA. Proposed Rule, 86 Fed. Reg. at 47,918. Subsequently, on October 15, 2008, the Service received another petition to list six species of freshwater mussels—including the Texas Pimpleback, Texas fawnsfoot, and the false spike—as threatened or endangered. *Id*. The Service then determined that the two petitions "presented substantial scientific information indicating that listing the Texas fatmucket, Texas pimpleback, Texas fawnsfoot, and false spike may be warranted." *Id*.

63.      On October 6, 2011, the Service published its 12-month finding for five mussels including the Texas fatmucket, Texas fawnsfoot, and Texas pimpleback. *Id*. at 47,919. The Service found that listing was warranted but was "precluded by higher priority actions." *Id*. The Service subsequently added the three species to its candidate list, which were included in subsequent notices of review. *Id*.

64.      The Service published the Proposed Rule on August 26, 2021. The Service noted that the "newly described" Guadalupe orb and Guadalupe fatmucket were previously included in the Service's evaluations for the Texas pimpleback and the Texas fatmucket, respectively. *Id*. The Proposed Rule also constituted the Service's 12-month finding for the false spike. *Id*.

65.      The Service received 9,837 comments on the Proposed Rule, including 9,804 form letters.[5] TCEQ, TPWD, and TxDOT each commented on the Proposed Rule, and their comments are collectively attached hereto as **Exhibit 7**.[6] Other entities including four river authorities,[7] the Pacific Legal Foundation,[8] Texas Public Policy Foundation,[9] and TSCRA[10] also commented on the Proposed Rule, and their comments are collectively attached hereto as **Exhibit 8**.

## FINAL RULE

66.      The Rule consists of three elements: a listing determination for the Central Texas Mussels, a Section 4(d) regulation for the Texas fawnsfoot, and critical habitat designations for all seven species. Final Rule, 89 Fed. Reg. at 48,034. Each element, however, suffers from legal and procedural deficiencies that are fatal to the Final Rule.

### Listing Determination

67.      The Final Rule lists the Guadalupe fatmucket, Texas fatmucket, Guadalupe orb, Texas pimpleback, Balcones spike, and false spike as endangered and the Texas fawnsfoot as threatened ("Listing Determination"). *Id.* at 48,062–63. In arriving at its Listing Determination,

---

[5] All comments are available through the Service's online rulemaking docket, FWS-R2-ES-2019-0061, which can be found at https://www.regulations.gov/docket/FWS-R2-ES-2019-0061/comments.

[6] *See generally* Comment Letter from TCEQ to the Service (Oct. 25, 2021) (hereinafter "TCEQ Comment Letter"); TxDOT Comment Letter; TPWD Comment Letter.

[7] *See generally* Comment Letter from Brazos River Authority to the Service (Oct. 18, 2021) (hereinafter "BRA Comment Letter"); Comment Letter from Guadalupe-Blanco River Authority to the Service (Sept. 28, 2021) (hereinafter "GBRA Comment Letter"); Comment Letter from Lower Colorado River Authority & LCRA Transmission Services Corporation to the Service (Oct. 25, 2021) (hereinafter "LCRA Comment Letter"); Comment Letter from Upper Guadalupe River Authority to the Service (Oct. 20, 2021) (hereinafter "UGRA Comment Letter").

[8] *See generally* Comment Letter from Pacific Legal Foundation to the Service (Oct. 18, 2021) (hereinafter "PLF Comment Letter").

[9] *See generally* Comment Letter from Texas Public Policy Foundation to the Service (Oct. 25, 2021) (hereinafter "TPPF Comment Letter").

[10] *See generally* TSCRA Comment Letter.

the Service examined the Central Texas Mussels' viability, perceived risk factors, and current condition. *See generally id*. at 48,048–58. Additionally, the Service considered a limited number of actions currently in place to preserve the species. *Id*. at 48,058–59.

68.     When examining the Central Texas Mussels' viability, the Service, in part, examined their resiliency, which is "the ability of the species to withstand environmental and demographic stochasticity." *Id*. at 48,048. The Service found that mussel populations resiliency is associated with the length of stream that they occupy, with populations occupying reaches of 50 miles or greater to have the most resiliency. *Id*. The Service also maintained that, for mussel populations to be sufficiently resilient, "there must be many mussel beds of sufficient density such that local stochastic events do not necessarily eliminate the bed(s), allowing the mussel bed and the overall local population within a stream reach to recover from any single event." *Id*. at 48,048–49. Finally, for a mussel population to be sufficiently resilient, the Service stated that there must be adequate reproduction and recruitment of mussels into the population. *Id*. at 48,049. This resiliency, according to the Service, varies from species to species. *Compare id*. at 48,055 (explaining that the Guadalupe fatmucket has low abundance with little evidence of reproduction) *with id*. at 48,057 (explaining the Middle/Lower Brazos River population of the Texas fawnsfoot "occupies a fairly long reach of river . . . and exhibits evidence of reproduction.").

69.     The Service identified six primary risk factors that impact the Central Texas Mussels, with each being tied to a specific statutory factor. These risk factors include: (1) Increased fine sediment (16 U.S.C. § 1533(a)(1)(A)); (2) Changes in water quality (16 U.S.C. § 1533(a)(1)(A)); (3) Altered hydrology in the form of inundation (16 U.S.C. § 1533(a)(1)(A)); (4) Altered hydrology in the form of loss of flow and scour of substrate (16 U.S.C. § 1533(a)(1)(A)); (5)

Predation and collection (16 U.S.C. § 1533(a)(1)(C)); and (6) Barriers to fish movement (16 U.S.C. § 1533(a)(1)(E). Final Rule, 89 Fed. Reg. at 48,049. The Service also anticipated that effects from climate change, such as increased temperature and increased flooding, would exacerbate these risk factors. *Id.* at 48,054.

70.     The Service concluded that, throughout their respective ranges, the Guadalupe fatmucket, Texas fatmucket, Guadalupe orb, Texas pimpleback, Balcones spike, and false spike populations maintained little to no resiliency, with certain populations being functionally extirpated. *Id.* at 48,060–61. Taken together with the risk factors, the Service concluded that these six species are currently in danger of extinction and thus qualified to be listed as endangered. *Id.* at 48,062–63.

71.     The Texas fawnsfoot, according to the Service, maintains seven populations throughout its range, with over half being moderately healthy. *Id.* The Service concluded that although the Texas fawnsfoot faces threats to its continued existence, it not presently at risk of extinction throughout any portion of its range. *Id.* Accordingly, the Service found that the Texas fawnsfoot meets the definition of a threatened species and listed it accordingly. *Id.* at 48,063.

**A.     The Listing Determination's Failure to Account for All Existing Protections**

72.     Although the Service considered some efforts being taken to protect the Central Texas Mussels, the Listing Determination fails to account for all efforts being taken to conserve the species.

73.     The Final Rule contains a brief discussion of the conservation efforts and regulatory mechanisms that were considered when developing the Listing Determination. *See id.* at 48,058–59. The Final Rule acknowledges the development of "voluntary agreements with private

landowners to restore or enhance habitats for fish and wildlife" that will "reduce threats to the species while improving instream physical habitat and water quality, as well as adjacent riparian and upland habitats." *Id.* at 48,058. Specifically, the Final Rule references the development and implementation of candidate conservation agreements by various river authorities,[11] presence of conservation easements, and comprehensive conservation plans to address soil, water, and wildlife resource concerns in the lower Colorado River Basin. *Id.* at 48,058–59.

74.    The Final Rule also acknowledges "active efforts to protect, maintain, and improve existing water quantity in waters known to be important for mussel populations and to reduce threats of flow loss." *Id.* at 48,059. The Service discusses the Texas Instream Flow Program and "the creation of a comprehensive, statewide process to protect environmental flows." *Id.* (internal quotations omitted). The Final Rule notes that "[e]nvironmental flow recommendations have been set for each of the river basins occupied by" the Central Texas Mussels. *Id.*

75.    Finally, the Service acknowledges "annual mussel research and coordination meetings to help manage and monitor scientific collection of mussel populations" to assist with conservation efforts, as well as evaluations of "methods of captive propagation" for the Central Texas Mussels. *Id.*

76.    Notably absent from the Final Rule is any discussion of the LIP, which was developed "to meet the needs of private, non-federal landowners wishing to enact good conservation practices on their lands for the benefit of healthy terrestrial and aquatic ecosystems."

---

[11] The Service provides a detailed discussion of private and other non-Federal conservation plans when discussing the critical habitat designation. *See* Final Rule, 89 Fed. Reg. at 48,088–96. This discussion details conservation plans submitted by the Brazos River Authority, Lower Colorado River Authority, and Trinity River Authority that were considered when excluding stretches of river as critical habitat. This discussion does not apply to the Listing Determination.

TPWD, Landowner Incentive Program (last accessed Oct. 18, 2024), https://tpwd.texas.gov/landwater/land/private/lip/. The Final Rule also fails to make any mention of the PECE, thus making it unclear as to whether the Service applied its internal policies when considering existing protections during the listing process.

77. The Service also summarily dismissed the existing regulatory and statutory scheme in place to protect the Central Texas Mussels. Instead of considering the existing protections, the Service implied that its hands were tied by procedural requirements. Final Rule, 89 Fed. Reg. at 48,043. In response to a comment that the Listing Determination was unnecessary due to Texas's existing protections,[12] the Service explained:

> In 2007 and 2008, we received petitions requesting that we list as endangered or threatened species and designate critical habitat for the Texas fatmucket, Texas fawnsfoot, Texas pimpleback, and false spike. . . . In 2009, the State of Texas listed the Texas fatmucket, Texas fawnsfoot, Texas pimpleback, and the false spike as threatened, launching an era of freshwater mussel conservation Statewide and bringing attention to this faunal group. However, once the Service is petitioned to list a species, we are required to complete our regulatory process which takes into account conservation efforts and State regulatory efforts in our listing determination. Under the requirements of the Act, we must conduct the required analysis and list the species if it is found to be warranted, and we cannot defer to any State listing.

*Id.* (internal citations omitted).

**B.      The Listing Determination's Vague, Unclear Discussion on "Take"**

78.      By listing the Guadalupe fatmucket, Texas fatmucket, Guadalupe orb, Texas pimpleback, Balcones spike, and false spike as endangered, the Final Rule made it illegal to take these species. *Id.* at 48,064. A "take" includes harassing, harming, pursuing, hunting, shooting,

---

[12] TPPF Comment Letter at 5.

wounding, killing, trapping, capturing, or collecting an endangered species, or attempting any of these activities. 16 U.S.C. § 1532(19).

79.    The Final Rule falls short of the Service's policy to "identify to the extent known at the time a species is listed, specific activities that will not be considered likely to result in violation of section 9" of the ESA. Final Rule, 89 Fed. Reg. at 48,064 (citing Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions, 59 Fed. Reg. 34,272 (July 1, 1994) ("Section 9 Policy")). The Section 9 Policy requires the Service to identify activities that would result in a take "in as specific a manner as possible." Section 9 Policy, 59 Fed. Reg. at 34,272.

80.    The Final Rule states generally that activities that may or may not constitute a violation of Section 9 "may be identified during coordination with the local field office." Final Rule, 89 Fed. Reg. at 48,064. The Service also provides an illustrative, non-exhaustive list of broad activities that "will be considered likely to result in violation of section 9." *Id*. This list includes:

- Unauthorized handling or collecting of the species;

- Modification of the channel or water flow of any stream in which the Central Texas Mussels are known to occur;

- Livestock grazing that results in direct or indirect destruction of stream habitat; and,

- Discharge of chemicals or fill material into any waters in which the Central Texas Mussels are known to occur.

*Id*.

81.    The Final Rule's list of ill-defined activities that "will be considered likely" to constitute a violation, with no limit to additional, unspecified activities that "may" be considered

a violation, is overly vague and violates the Section 9 Policy, making compliance impossible.[13] Section 9 Policy, 59 Fed. Reg. at 34,272.

## C.    The Listing Determination's Untimeliness

82.    The Service published the Final Rule later than what is permitted by the ESA. For listing determinations, the Service is generally required to publish its final decision no later than one year after publication of its proposed listing. 16 U.S.C. § 1533(b)(6)(A)(i). The Service may within that same one-year period publish notice that it is extending the decision deadline by six months if "there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination." *Id.* § 1533(b)(6)(A)(i)(III), (B)(i). But if the Service does not publish a final decision within either the one-year period or the extended 18-month period because there is a lack of supporting evidence, then the Service is required to "immediately withdraw" its listing and cannot re-publish it unless "sufficient new information is available to warrant such proposal." *Id.* § 1533(b)(6)(B)(ii).

83.    The Final Rule's Listing Determination does not meet this criteria. The Proposed Rule was published in the Federal Register on August 26, 2021. Final Rule, 89 Fed. Reg. at 48,036. Thus, the Service was required to publish the Listing Determination on or before August 26, 2022, or publish notice that the deadline was being extended. It did not. Instead, the Listing Decision was published on June 4, 2024—nearly two years after the initial deadline and 16 months after the potential extended deadline. The Service did not—and could not—provide an explanation to justify the delay despite having full knowledge of the ESA's time constraints.[14]

---

[13] LCRA Comment Letter at 3–4 (voicing concerns regarding what may constitute a "take" under Section 9).
[14] *See, e.g.,* Endangered and Threatened Wildlife and Plants; Lesser-Prairie Chicken; Threatened Status With Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population

**Section 4(d) Rule**

84.    The Final Rule establishes a Section 4(d) regulation for the Texas fawnsfoot "designed to address the Texas fawnsfoot's specific threats and conservation needs" ("Section 4(d) Rule"). Final Rule, 89 Fed. Reg. at 48,065. Generally speaking, the Section 4(d) Rule's protections "incorporate prohibitions from section 9(a)(1) to address the threats to the species" and thus prohibits the following activities: "importing or exporting; take; possession and other acts with unlawfully taken specimens; delivering, receiving, carrying, transporting, or shipping in interstate or foreign commerce in the course of commercial activity; and selling or offering for sale in interstate or foreign commerce." *Id.*; *see also* 16 U.S.C. § 1538(a)(1).

A.    **The Section 4(d) Rule's Vague Provisions**

85.    The Section 4(d) Rule imposes sweeping restrictions that "help to prevent [Texas fawnsfoot population] declines, preserve the species' remaining populations, slow its rate of decline, and decrease synergistic, negative effects from other ongoing or future threats." Final Rule, 89 Fed. Reg. at 48,065. The Section 4(d) Rule broadly regulates "take associated with activities that increase siltation, diminish water quality, alter stream flow, or reduce fish passage." *Id.*

86.    The Section 4(d) Rule provides that "most of the general exceptions" codified at 50 C.F.R. § 17.21 apply to its prohibitions on take. *Id.* The Section 4(d) Rule also creates exceptions to the take prohibition for four categories of activities: (1) "[c]hannel restoration projects that create natural, physically stable . . . , ecologically functioning streams or stream and wetland streams . . . that are reconnected with their groundwater aquifers," (2) "[b]ioengineering methods such as

---

Segment, 87 Fed. Reg. 72,674, 72,716 (Nov. 25, 2022) (citing the ESA's time constraints to deny additional time to comment on the proposed listing).

streambank stabilization using native live stakes . . ., native live fascines . . ., or native brush layering," (3) "[s]oil and water conservation practices and riparian and adjacent upland habitat management activities," and (4) "[p]resence or abundance surveys" conducted by qualified individuals. *Id*. at 48,065–66.

87.     Like the Final Rule's description of activities that would result in a take of the endangered species, the Section 4(d) Rule suffers from the same vagueness.[15] The Final Rule notes that "[a] range of activities have the potential to affect the Texas fawnsfoot, including instream construction, channel modification, water withdrawals, flow releases from upstream dams, riparian vegetation removal, improper handling, farming and grazing practices, and wastewater treatment facility outflows." *Id*. at 48,065. But the Service fails to identify with any degree of specificity the bounds of those activities, as required by the APA and the Service's own policy. Section 9 Policy, 59 Fed. Reg. at 34,272. The Section 4(d) Rule's vagueness makes it nearly impossible for the public to understand what activities may or may not result in a take.

**B.     The Section 4(d)'s Missing NEPA Analysis**

88.     A NEPA analysis is required for all major federal actions that have a significant impact on the human environment, including the promulgation of rules and regulations like the Section 4(d) Rule. The ESA grants the Service broad authority under Section 4(d) to develop any regulations that are "necessary and advisable to provide for the conservation" of threatened species, which includes the authority to extend the take prohibition of Section 9 to threatened

---

[15] *Cf.* Comment Letter from National Wildlife Foundation, et al. to the Service, 10 (Oct. 25, 2021) ("The proposed exceptions . . . are overbroad and, accordingly, will result in an inappropriately broad suite of ill-defined activities being excepted from the take prohibition. In particular, more specific constraints are needed to define when the listed exceptions will apply in order to minimize potential ambiguity.").

species. *See* 16 U.S.C. § 1533(d). Such protective regulations are likely to have significant environmental consequences that are required to be analyzed under NEPA.

89.     The Service declined to conduct a NEPA analysis, reasoning that "[r]egulations adopted pursuant to section 4(a) of the [ESA] are exempt from [NEPA] and do not require an environmental analysis" and that this so-called exemption extended to "species-specific protective regulations promulgated concurrently with a decision to list or reclassify a species as threatened." Final Rule, 89 Fed. Reg. at 48,098. While the Service responded to a comment regarding NEPA's applicability to critical habitat designations, *id.* at 48,039, the Service was silent as to similar comments regarding the Section 4(d) Rule.[16] Such failure was arbitrary and capricious and undermined public participation in the rulemaking process.

### Critical Habitat Designation

90.     The Final Rule designates approximately 1,577.5 river miles of critical habitat for the Central Texas Mussels throughout the Brazos, Colorado, and Guadalupe River Basins ("Critical Habitat Designation"). *Id.* at 48,071. The Critical Habitat Designation includes large stretches of river that the Service deemed necessary to allow for "adequate numbers of mussels in stable populations that occur over a wide geographic area" in order to protect the species from environmental changes. *Id.* at 48,070.

91.     In making the Critical Habitat Designation, the Service "delineated critical habitat unit boundaries by evaluating habitat suitability of stream segments within the geographical area occupied at the time of listing and retaining those segments that contain some or all of the PBFs to

---

[16] PLF Comment Letter at 10–11 (noting that "[t]he Service has offered no explanation why the proposed 4(d) rule for the Texas fawnsfoot is not being analyzed under NEPA"); TPPF Comment Letter at 4–5 (stating that the Service should undergo a NEPA analysis for the Section 4(d) Rule).

support life-history functions essential for conservation of" the Central Texas Mussels. *Id.* Specifically, with each species, the Service evaluated the space for population growth and function, water quality, and sites conducive to reproduction. *Id.* at 48,068–69. To conclude its designation, the Service "refined the starting and ending points by evaluating the presence or absence of appropriate PBFs" and "selected upstream and downstream cutoff points to reference existing easily recognizable geopolitical features including confluences, highway crossings, and county lines." *Id.* at 48,070.

92.     The Critical Habitat Designation contains 20 units with 32 subunits that the Service deems necessary to conserve the Central Texas Mussels and that contain all appropriate PBFs. *Id.* at 48,071. All but four of the subunits are currently occupied by at least one species of the Central Texas Mussels. *Id.* The four unoccupied subunits, according to the Service, "are located immediately adjacent to currently occupied stream reaches that are relatively short . . ., include one or more of the essential PBFs, and allow for expansion of existing populations as necessary to improve population resiliency, extend physiographic representation, and reduce the risk of extinction of the species." *Id.* at 48,070.

93.     Critical habitat for the Guadalupe fatmucket consists of 52.2 river miles in the Guadalupe River Unit (GUFM-1) with three occupied subunits, including the North Fork Guadalupe River Subunit (GUFM-1a), Johnson Creek Subunit (GUFM-1b), and Guadalupe River Subunit (GUFM-1c). *Id.* at 48,073–74.

94.     Critical habitat for the Texas fatmucket consists of 419.5 river miles in six units with 11 subunits. *Id.* at 48,074. The Elm Creek Unit (TXFM-1) consists of two occupied subunits, including the Bluff Creek Subunit (TXFM-1a) and Lower Elm Creek Subunit (TXFM-1b), as well

34

as the unoccupied Upper Elm Creek Subunit (TXFM-1c). *Id.* at 48,075–76. The Llano River Unit (TXFM-4) consists of six occupied subunits, including the North Llano River Subunit (TXFM-4a), South Llano River Subunit (TXFM-4b), Llano River Subunit (TXFM-4c), James River Subunit (TXFM-4d), Threadgill Creek Subunit (TXFM-4e), and Beaver Creek (TXFM-4f). *Id.* at 48,076–77. The Pedernales River Unit (TXFM-5) consists of two occupied subunits including, the Pedernales River Subunit (TXFM-5a) and the Live Oak Creek Subunit (TXFM-5b). *Id.* at 48,077–78. The San Saba River Unit (TXFM-2), Cherokee Creek Unit (TXFM-3), and Onion Creek Unit (TXFM-6) have no subunits and are all occupied. *Id.* at 48,076, 78.

95.    Critical habitat for the Texas fawnsfoot consists of 192.7 river miles in three units with four subunits. *Id.* at 48,078. The Clear Fork Brazos River Unit (TXFF-1) consists of the occupied Upper Clear Fork Brazos River Subunit (TXFF-1a) and the unoccupied Lower Clear Fork Brazos River Subunit (TXFF-1b). *Id.* at 48,078–79. The Upper Brazos River Unit (TXFF-2) has no subunits and is occupied. *Id.* at 48,079. The Lower San Saba River and Upper Colorado River Unit (TXFF-5) consists of two occupied subunits including, the Lower San Saba Subunit (TXFF-5a) and Upper Colorado River Subunit (TXFF-5b). *Id.* at 48,079–80.

96.    Critical habitat for the Guadalupe orb consists of 288.5 river miles in two units with four subunits. *Id.* at 48,080. The Upper Guadalupe River Unit (GORB-1) consists of two occupied subunits including, the South Fork Guadalupe River Subunit (GORB-1a) and the Upper Guadalupe River Subunit (GORB-1b). *Id.* at 48,080–81. The Lower Guadalupe River Unit (GORB-2) consists of two occupied subunits, including the San Marcos River Subunit (GORB-2a) and the Lower Guadalupe River Subunit (GORB-2b). *Id.* at 48,081.

97. Critical habitat for the Texas pimpleback consists of 602.1 river miles in five units with eight subunits. *Id*. The Elm Creek Unit (TXPB-1) consists of two occupied subunits including the Bluff Creek Subunit (TXPB-1a) and the Lower Elm Creek Subunit (TXPB-1b). *Id*. at 48,082. The Concho River Unit (TXPB-2) consists of the occupied Lower Concho River Subunit (TXPB-2a) and the unoccupied Upper Concho River Subunit (TXPB-2b). *Id*. at 48,082–83. The Upper Colorado River and Lower San Saba River Unit (TXPB-3) consists of two occupied subunits including the Upper Colorado Subunit (TXPB-3a) and the Lower San Saba River Subunit (TXPB-3b). *Id*. at 48,083. The Upper San Saba River Unit (TXPB-4) has no subunits and is occupied. *Id*. The Llano River Unit (TXPB-5) consists of the occupied Upper Llano River Subunit (TXPB-5a) and the unoccupied Lower Llano River Subunit (TXPB-5b). *Id*. at 48,083–84.

98. Critical habitat for the Balcones spike consists of 98.1 river miles in two units. *Id*. at 48,084. The San Saba River Unit (BASP-2) and Llano River Unit (BASP-3) have no subunits and are both occupied. *Id*. at 48,084–85.

99. Critical habitat for the false spike consists of 143.6 river miles in one unit with two occupied subunits. *Id*. at 48,085. The Guadalupe River Unit (FASP-1) consists of the San Marcos River Subunit (FASP-1a) and the Guadalupe River Subunit (FASP-1b). *Id*. at 48,085–86.

## A. The Critical Habitat Designation's Failure to Consider Best Available Science

100. As part of the Critical Habitat Designation, the Service cites the Central Texas Mussels' need for "[w]ater and sediment quality . . . necessary to sustain natural physiological processes for normal behavior, growth, and viability of all life stages." *Id*. at 48,069.

101. When proposing the initial Critical Habitat Designation, the Service identified several factors that contributed to suitable aquatic habitat for the Central Texas Mussels, including:

- Low salinity (less than 2 [parts per thousand]);

- Low total ammonia (less than 0.77 [milligrams per liter ("mg/L")] total ammonia nitrogen);

- Low levels of contaminants such as heavy metals and chemical constituents;

- Dissolved oxygen levels greater than 2 mg/L; and

- Water temperatures below 29 °C (or 84.2 °F).

Proposed Rule, 86 Fed. Reg. at 47,951.

102. TCEQ commented in response to the Service's findings regarding water quality throughout the proposed Critical Habitat Designation. Specifically, TCEQ asserted that the 0.77 mg/L total ammonia nitrogen reference was inappropriate as a component of critical habitat and that it should instead be used as a reference recommendation only. TCEQ Comment Letter at 2. Further, TCEQ critiqued the Proposed Rule for failing to use information on water quality, and that several assertions of water quality degradation found in several subunits were unsubstantiated by the most recent water quality assessments. *Id*. at 2–4.

103. The Final Rule ignores these concerns and adopts the same water quality parameters as proposed. Final Rule, 89 Fed. Reg. at 48,069. The Service did not address—or even acknowledge—TCEQ's concerns in the Final Rule. The only reference to the propriety of ammonia concentrations came in response to a separate comment, citing an example of ammonia concentrations in certain unidentified segments of the Colorado River. *Id*. at 48,040. Thus, by ignoring this information, the Critical Habitat Designation was not made "on the basis of the best scientific data available." 16 U.S.C. § 1533(b)(2).

**B.    The Critical Habitat Designation's Failure to Consider Economic Impact**

104.    When developing the Critical Habitat Designation, the Service described how it assesses economic impact in accordance with the ESA:

> To assess the probable economic impacts of a designation, we must first evaluate specific land uses or activities and projects that may occur in the area of the critical habitat. We then must evaluate whether a specific critical habitat designation may restrict or modify specific land uses or activities for the benefit of the species and its habitat within the areas proposed. We then identify which conservation efforts may be the result of the species being listed under the Act versus those attributed solely to the designation of critical habitat. The probable economic impact of a proposed critical habitat designation is analyzed by comparing scenarios both "with critical habitat" and "without critical habitat."

Proposed Rule, 86 Fed. Reg. at 47,972.

105.    The Service considered seven categories of activities that may be impacted by the Critical Habitat Designation: Federal lands management; agriculture; forest management, silviculture, and timber; development; recreation; restoration activities; and transportation. *Id.* at 47,973. After acknowledging the difficulty in "discern[ing] which conservation efforts are attributable to the species being listed and those which would result solely from the designation of critical habitat," the Service stated that the only costs attributable to the Critical Habitat Designation were "administrative costs" associated with consultations required under Section 7 of the ESA.[17] *Id.* Accordingly, the Service asserted that the total cost of the proposed Critical Habitat Designation would not exceed $82,500.00 per year. *Id.*

---

[17] Section 7(a) requires federal agencies to consult the Service regarding "any agency action which is likely to jeopardize the continued existence of any species proposed to be listed . . . or result in the destruction or adverse modification of critical habitat proposed to be designated for such species." 16 U.S.C. § 1536(a)(4).

106.    In addition to comments critiquing the Service's failure to account for the Critical Habitat Designation's impact on property values,[18] TCEQ commented regarding insufficiencies in the Service's economic analysis. Specifically, TCEQ voiced concern regarding the "financial hardship" that would come with expected upgrades and greater stringency in permit requirements imposed on permitted wastewater discharge facilities located in or near the areas covered by the Critical Habitat Designation, and that the Service failed to account for these costs. TCEQ Comment Letter at 5.

107.    In issuing the Final Rule, the Service acknowledged the comments critiquing its economic analysis but, instead of denying the impacts, doubled down on the approach used for the Proposed Rule. Final Rule, 89 Fed. Reg. at 48,038. The Service cited to two Ninth Circuit cases[19] as support for its decision to measure only incremental costs of the Critical Habitat Designation (rather than an extensive analysis considering all economic impacts) and reaffirmed its approach to an incremental analysis. *Id.* (citing Endangered and Threatened Wildlife and Plants; Revisions to the Regulations for Impact Analyses of Critical Habitat, 78 Fed. Reg. 53,058, 53,062 (Aug. 28, 2013) (codified at 50 C.F.R. pt. 424)). Despite being aware of the costs imposed by the Critical Habitat Designation, the Service ignores these costs, thus violating its statutory obligation to consider the economic impact of such designation. 16 U.S.C. § 1533(b)(2).

---

[18] PLF Comment Letter at 11 – 15; TPPF Comment Letter at 2–4.

[19] *Home Builders Ass'n of N. Cal. v. U.S. Fish and Wildlife Serv.*, 616 F.3d 983 (9th Cir. 2010), cert. denied, 562 U.S. 1217 (2011); *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010), cert. denied, 562 U.S. 1216 (2011).

**C.      The Critical Habitat Designation was Not Subject to Proper Notice and Comment**

108.      Although the Service provided notice and solicited public comment on the Critical Habitat Designation, Proposed Rule, 86 Fed. Reg. at 47,973, the final designation deviates from the Proposed Rule in how it defines "habitat."

109.      In the Proposed Rule, the Service defined "habitat," as used in its critical habitat designations, as "the abiotic and biotic setting that currently or periodically contains the resources and conditions necessary to support one or more life processes of a species." *Id*. at 47,948. This definition was established in 2020 in response to the Supreme Court's holding in *Weyerhaeuser*, to "provide[] transparency, clarity, and consistency for stakeholders." Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 Fed. Reg. 81,411, 81,411 (Dec. 16, 2020) (codified at 50 C.F.R. pt. 424).

110.      Immediately upon taking office in January 2021, President Biden issued Executive Order 13,990 requiring agencies to "immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions" promulgated under the Trump Administration "that are or may be inconsistent with" President Biden's stated environmental goals. Exec. Order No. 13,990 sec. 2, 86 Fed. Reg. 7,037, 7,037 (Jan. 20, 2021). Additionally, the heads of all federal agencies were directed to "consider suspending, revising, or rescinding" such agency actions. *Id*.

111.      On October 27, 2021, in response to President Biden's directive, the Service issued a notice of proposed rulemaking to rescind the regulatory definition of "habitat." Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 86 Fed. Reg. 59,353 (Oct. 27, 2021) (to be codified at 50 C.F.R. pt.

40

424). This proposed rulemaking was issued two days after the comment period for the Central Texas Mussels closed[20] and was finalized on June 24, 2022. Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 Fed. Reg. 37,757 (June 24, 2022) (codified at 50 C.F.R. pt. 424). As a result of this change in position, the Service now "determine[s] what areas qualify as habitat for a given species on a case-by-case basis using the best scientific data available for the particular species." *Id*. at 37,758.

112.    When the Service published the Final Rule nearly two years later, it acknowledged the change in definition. Final Rule, 89 Fed. Reg. at 48,067. Instead of applying the regulatory definition of "habitat," as it had done with the Proposed Rule, the Service instead applied general regulations applicable to critical habitat and a 2016 policy on exclusions of areas from critical habitat designations. *Id*. (citing 50 C.F.R. § 424.19; Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act," 81 Fed. Reg. 7,226 (Feb. 11, 2016) (codified at 50 C.F.R. pt. 424)).

113.    At no point did the Service provide notice and an opportunity to comment on this changed approach as it applies to the Central Texas Mussels and the Critical Habitat Definition, thus undermining the public participation requirements of both the ESA and the APA.

**D.    The Critical Habitat Designation's Untimeliness**

114.    As with the Listing Determination, the Service was late in publishing the Critical Habitat Designation. The Service is required, within one year of publication of a proposed designation, to publish either the final critical habitat designation or a notice extending the publication period. 16 U.S.C. § 1533(b)(6)(A)(ii). The Service may only extend the publication

---

[20] Proposed Rule, 86 Fed. Reg. at 49,916 ("We will accept comments received or postmarked on or before October 25, 2021.").

deadline by up to one year if "critical habitat of such species is not then determinable," and, at the conclusion of the extra year, "the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." *Id*. § 1533(b)(6)(C)(ii); *see also*, Proposed Rule 86 Fed. Reg. at 47,950 ("When critical habitat is not determinable, the Act allows the Service an additional year to publish a critical habitat designation.").

115.    The initial Critical Habitat Designation was published as part of the Proposed Rule on August 26, 2021. Proposed Rule, 86 Fed. Reg. at 47,954. Accordingly, the Service was required to publish either the final Critical Habitat Designation or notice of an extension by August 26, 2022. It did neither, opting to publish the final Critical Habitat Designation with the Final Rule on June 4, 2024. Thus, the Critical Habitat Designation was published nearly two years—or 10 months, had the Service triggered the permissive extension—after what is contemplated by the ESA.

<strong>Missing Federalism Analysis</strong>

116.    In addition to the element-specific deficiencies listed above, the Service arbitrarily failed to conduct a federalism analysis before promulgating the Final Rule.

117.    In 1999, President Clinton issued Executive Order 13,132 (the "Order"), in part, "to ensure that the principles of federalism established by the Framers guide the executive departments and agencies in the formulation and implementation of policies." Exec. Order 13,132, 64 Fed. Reg. 43,255, 43,255 (Aug. 4, 1999). The Order applies to regulations, such as the Final Rule, "that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." *Id*. sec. 1(a), 64 Fed. Reg. at 43,255.

42

118.    The Order recognizes the importance of local governance and that the "national government should be deferential to the States when taking action that affects the policymaking discretion of the States." *Id.* sec. 2(a), (i), 64 Fed. Reg. at 43,255–56. Accordingly, federal agencies are required to "carefully assess the necessity" of any action that would "limit the policymaking discretion of the States." *Id.* sec. 3(a), 64 Fed. Reg. at 43,256. Agencies must defer to the States' regulatory processes, where possible, and "[a]ny regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated." *Id.* secs. 3(d)(2), 4(c), 64 Fed. Reg. at 43,256–57.

119.    Despite the Final Rule's "significant federalism implications," TCEQ Comment Letter at 6, the Service declined to conduct any analysis of the Rule's impact on Texas. Instead, the Service summarily concluded that the Final Rule "does not have any significant federalism effects, and a federalism summary impact statement is not required." Final Rule, 89 Fed. Reg. at 48,037; *see also id.* at 48,098. This refusal ignores a directive fundamental to modern administrative law and ignores the Framers' desired balance of power between the federal government and the States.

### CLAIMS FOR RELIEF

### Claim I: The Final Rule Violates the ESA

120.    Plaintiff realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

121.    By issuing the Final Rule and listing the Central Texas Mussels as threatened and endangered, the Service failed to comply with the ESA requirement to consider any conservation efforts being made by states or political subdivisions to protect the species. 16 U.S.C. § 1533(b)(1)(A).

122. The Final Rule's Critical Habitat Designation is not supported by the best available scientific information, as required by the ESA. *Id.* § 1533(b)(2). The Service also failed to consider the Critical Habitat Designation's economic impact, as required by the ESA. *Id.*

123. The Service published the Final Rule on June 4, 2024. In doing so, the Service violated the ESA by publishing the Listing Determination 34 months after the Proposed Rule. *Id.* § 1533(b)(6)(A), (B). The Service also violated the ESA by publishing the Critical Habitat Designation 34 months after the Proposed Rule. *Id.* § 1533(b)(6)(A), (C).

### Claim II: The Final Rule Violates the APA

124. Plaintiff realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

125. First, in developing the Final Rule's Listing Determination, the Service did not adequately consider the efforts undertaken by Texas to protect the Central Texas Mussels. The Service is required to "tak[e] into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species." 16 U.S.C. § 1533(b)(1)(A). Furthermore, the Service's PECE requires the Service to evaluate the propriety of a listing in light of formalized conservation efforts. The Service failed to adequately consider Texas's existing statutory, regulatory, and programmatic approaches to protecting the Central Texas Mussels. Thus, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

126. Second, the Service did not consider the best available scientific data when implementing the Final Rule's Critical Habitat Designation. The Service is required to make critical habitat designations "on the basis of the best scientific data." 16 U.S.C. § 1533(b)(2). The

Service ignored recent water quality data presented to it by the TCEQ during the notice and comment period. Thus, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

127.   Third, the Service did not consider the economic impact of the Critical Habitat Designation. The Service is required to consider the economic impact of the Critical Habitat Designation. 16 U.S.C. § 1533(b)(2). Instead, the Service disregarded the impacts to property values and wastewater facilities located in or near the Critical Habitat Designation and opted to evaluate costs on an incremental basis. Thus, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

128.   Fourth, the Final Rule is overly vague and does not adequately describe the activities that may violate the Rule. The Service does not specify the activities that may or may not result in a take, as required by the Service's own policy. Thus, the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be held unlawful and set aside. *Id*.

129.   Fifth, the Listing Determination and the Critical Habitat Designation were published in the Federal Register 34 months after the Service published the Proposed Rule—later than is required by the ESA. Thus, the Final Rule was promulgated "without observance of procedure required by law" and must be held unlawful and set aside. *Id*. § 706(2)(D).

130.   Sixth, and finally, the Critical Habitat Designation was not properly noticed to the public—it was implemented without providing interested parties notice and an opportunity to

comment on the applicable definition of "habitat." Thus, the Final Rule was promulgated "without observance of procedure required by law" and must be held unlawful and set aside. *Id*.

**Claim III: The Final Rule Violates NEPA**

131.    Plaintiff realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

132.    In issuing the Final Rule's Section 4(d) Rule, the Service declined to follow NEPA, preparing neither an Environmental Assessment nor an Environmental Impact Statement. Neither the ESA nor any other statute exempts Section 4(d) regulations from complying with NEPA, and the Service's actions are thus in violation of NEPA.

133.    The Service's failure to comply with NEPA constitutes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and, as such, the Final Rule must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(1)    adjudge and declare that the rulemaking titled "Endangered and Threatened Wildlife and Plants; Endangered Species Status With Critical Habitat for Guadalupe Fatmucket, Texas Fatmucket, Guadalupe Orb, Texas Pimpleback, Balcones Spike, and False Spike, and Threatened Species Status With Section 4(d) Rule and Critical Habitat for Texas Fawnsfoot" is unlawful because it violates the Endangered Species Act, the Administrative Procedure Act, and the National Environmental Policy Act;

(2)     adjudge and declare that the Final Rule is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers;

(3)     vacate the Final Rule;

(4)     award Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and,

(5)     grant Plaintiff such additional and further relief as the Court may deem just, proper, and necessary.

Dated: October 28, 2024                    Respectfully submitted,

                                           KEN PAXTON
                                           Attorney General of Texas

                                           BRENT WEBSTER
                                           First Assistant Attorney General

                                           RALPH MOLINA
                                           Deputy First Assistant Attorney General

                                           JAMES LLOYD
                                           Deputy Attorney General for Civil Litigation

                                           KELLIE E. BILLINGS-RAY
                                           Chief, Environmental Protection Division

                                           */s/ Wesley S. Williams*
                                           WESLEY S. WILLIAMS
                                           Assistant Attorney General
                                           Texas Bar No. 24108009
                                           Wesley.Williams@oag.texas.gov

                                           CLARK C. REEDER
                                           Assistant Attorney General
                                           Texas Bar No. 24118678
                                           Clark.Reeder@oag.texas.gov

47

CLAUDIA GUTIERREZ
Assistant Attorney General
Texas Bar No. 24140101
Claudia.Gutierrez@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

**COUNSEL FOR THE STATE OF TEXAS**