**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

|  |  |
|---|---|
| **STATE OF TEXAS,**<br><br>       *Plaintiff*,<br><br>**v.**<br><br>**U.S. DEPARTMENT OF THE INTERIOR,**<br>***ET AL.*,**<br><br>       *Defendants*. | **Civil Action No. 6:24-cv-81-H** |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

    I.   The Imperiled Central Texas Mussels ................................................................. 2

        A.   Texas Fatmucket ..................................................................................... 3

        B.   Guadalupe Fatmucket ............................................................................ 3

        C.   Texas Pimpleback .................................................................................. 3

        D.   Guadalupe Orb ....................................................................................... 4

        E.   False Spike ............................................................................................. 4

        F.   Balcones Spike ...................................................................................... 4

        G.   Texas Fawnsfoot .................................................................................... 5

    II.   The Endangered Species Act ............................................................................. 5

    III.   The Decades-Long Fight to Protect the Mussels .............................................. 8

    IV.   This Lawsuit ....................................................................................................... 10

    V.   Proposed Intervenor, Center for Biological Diversity ...................................... 11

ARGUMENT .................................................................................................................. 12

    I.   The Center is entitled to intervene as of right. .................................................. 12

        A.   The Center's Motion to Intervene is timely. ......................................... 12

        B.   The Center has a substantial interest in the continued protection of the Central Texas Mussels. ....................................................................... 14

        C.   An adverse ruling would harm the Center's interests. .......................... 16

        D.   Federal Defendants do not adequately represent the Center's interests. .................. 17

    II.   Alternatively, the Court should grant Permissive Intervention. ....................... 22

    III.   The Center has standing to pursue different relief from the existing parties. ............ 24

CONCLUSION ............................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**

*Am. Stewards of Liberty v. DOI*,
370 F. Supp. 3d 711 (W.D. Tex. 2019) ................................................................................. 22

*Am. Stewards of Liberty v. DOI*,
960 F.3d 223 (5th Cir. 2020) ............................................................................................... 13

*Aransas Project v. Shaw*,
404 F. App'x 937 (5th Cir. 2010) ........................................................................................ 12

*Ass'n of Conn. Lobbyists LLC v. Garfield*,
241 F.R.D. 100 (D. Conn. 2007) ......................................................................................... 23

*Ass'n of Pro. Flight Attendants v. Gibbs*,
804 F.2d 318 (5th Cir. 1986) ............................................................................................... 13

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995) ............................................................................................................... 8

*Berkley Nat'l Ins. Co. v. Ramos,* No. 5:23-CV-005-H, 2023 U.S. Dist. LEXIS 243765 (N.D. Tex.
June 29, 2023) ...................................................................................................................... 22

*Brumfield v. Dodd*,
749 F.3d 339 (5th Cir. 2014) .......................................................................................... 14, 21

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv. et al.,* Case No. 1:21-cv-00884
(D.D.C. Apr. 1, 2021) ............................................................................................................ 9

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, Case No. 4:23-cv-00287-LCK
(D. Ariz. June 22, 2023) ....................................................................................................... 10

*Colosi v. Charlotte County, Fla.*,
No. 24-cv-1004 (M.D. Fla. filed Oct. 29, 2024) .................................................................. 22

*DeOtte v. Azar*,
332 F.R.D. 173 (N.D. Tex. 2019) ........................................................................................ 22

*Doe No. 1 v. Glickman*,
256 F.3d 371 (5th Cir. 2001) ........................................................................ 12, 14, 15, 16, 17

*Edwards v. City of Houston*,
78 F.3d 983 (5th Cir. 1996) ...................................................................................... 13, 16, 21

*Endurance Am. Ins. Co. v. Lloyd's Syndicate 3624*,
No. 3:23-CV-0133, 2023 U.S. Dist. LEXIS 75051 (N.D. Tex. Apr. 28, 2023) .................... 22

*Franciscan All. Inc. v. Azar,* 414 F. Supp. 3d 928 (N.D. Tex. 2019) ......................................... 24

*Georgia v. U.S. Army Corps of Eng'rs*,
  302 F.3d 1242 (11th Cir. 2002)...................................................................................... 21

*La Union del Pueblo Entero v. Abbott,* 29 F.4th 299 (5th Cir. 2022)........................................... 12

*Louisiana v. Burgum*, 132 F.4th 918 (5th Cir. 2025).................................................................... 17

*Louisiana v. Haaland,* No. 2:23-CV-01157, 2023 U.S. Dist. LEXIS 163872 (W.D. La. Sep. 14,
  2023 .......................................................................................................................... 14, 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................................... 16

*Nat'l Press Photographers Ass'n v. McCraw*,
  594 F. Supp. 3d 789 (W.D. Tex. 2022) .............................................................................. 22

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2022 U.S. Dist.
  LEXIS 59549 (N.D. Tex. Mar. 31, 2022) ................................................................. 13, 14, 21

*NetChoice, L.L.C. v. Fitch*, No. 24-60341, ____ F.4th ___, 2025 U.S. App. LEXIS 9167 (5th Cir.
  Apr. 17, 2025) ................................................................................................................. 24

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*,
  732 F.2d 452 (5th Cir. 1984)............................................................................................. 23

*Ross v. Marshall*,
  426 F.3d 745 (5th Cir. 2005)............................................................................................. 17

*Sierra Club v. Espy*,
  18 F.3d 1202 (5th Cir. 1994)................................................................................... 15, 17, 21

*Spangler v. Pasadena City Bd. of Educ.*,
  552 F.2d 1326 (9th Cir. 1977)........................................................................................... 23

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ........................................................................................................... 6

*Tot Power Control, S.L. v. AT&T Mobility LLC*,
  No. 6:21-CV-00107, 2021 U.S. Dist. LEXIS 195476 (W.D. Tex. Oct. 8, 2021) ..................... 16

*Trbovich v. United Mine Workers of Am.*,
  404 U.S. 528 (1972) ................................................................................................... 17, 21

*Utah Ass'n of Counties v. Clinton*,
  255 F.3d 1246 (10th Cir. 2001).......................................................................................... 21

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
  834 F.3d 562 (5th Cir. 2016).......................................................................................... 12, 14

**Statutes**

16 U.S.C. § 1531(b) ................................................................................................................ 5

16 U.S.C. § 1532(19) ...................................................................................................... 8

16 U.S.C. § 1532(20) ...................................................................................................... 6

16 U.S.C. § 1532(6). ...................................................................................................... 6

16 U.S.C. § 1533(a)(1) ................................................................................................ 6, 7

16 U.S.C. § 1533(b)(3)(A). .......................................................................................... 6, 7

16 U.S.C. § 1533(b)(3)(B) ............................................................................................... 7

16 U.S.C. § 1533(b)(6)(A) ............................................................................................... 7

16 U.S.C. § 1533(d) ........................................................................................................ 8

16 U.S.C. § 1536 ............................................................................................................. 8

16 U.S.C. § 1536(a)(2) .................................................................................................... 8

16 U.S.C. § 1538 ............................................................................................................. 7

16 U.S.C. § 1539 ............................................................................................................. 8

16 U.S.C. § 1539(a)(1)(B) ............................................................................................... 8

16 U.S.C. § 1539(a)(2)(B)(iv) ......................................................................................... 8

## Rules

Fed. R. Civ. P. 24(a)(2) ................................................................................. 12, 14, 15, 17

## Other Authorities

50 C.F.R. § 17.3 ............................................................................................................. 8

50 C.F.R. § 402.01(b) ..................................................................................................... 6

50 C.F.R. § 424.11(b) ..................................................................................................... 7

74 Fed. Reg. 66260 (Dec. 15, 2009) ............................................................................... 9

76 Fed. Reg. 62166 (Oct. 6, 2011) ................................................................................. 9

84 Fed. Reg. 54732 (Oct. 10, 2019) ............................................................................... 9

86 Fed. Reg. 47916 (Aug. 26, 2021) ............................................................................... 9

89 Fed. Reg. 48034 (June 4, 2024) ................................................................1, 3-- 5, 9, 10

Exec. Order No. 14154,
    90 Fed. Reg. 8358 (Jan. 29, 2025) .......................................................................... 19

Exec. Order No. 14156,
    90 Fed. Reg. 8433 (Jan. 29, 2025) .......................................................................... 19

Exec. Order No. 14223, 90 Fed. Reg. 11359 (March 1, 2025). .......................................... 19

Exec. Order No. 14225, 90 Fed. Reg. 11365 (March 1, 2025)....................................................... 19

Exec. Order No. 14270, 90 Fed. Reg. 15643 (April 9, 2025)....................................................... 19

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

### INTRODUCTION

The Center for Biological Diversity ("Center") seeks to intervene as Defendant in this case to safeguard the interests of the organization and its members in protecting and conserving seven federally-listed freshwater mussels and their designated critical habitat. The Texas Fatmucket, Guadalupe Fatmucket, Guadalupe Orb, Texas Pimpleback, Balcones Spike, False Spike, and the Texas Fawnsfoot (collectively, "Central Texas Mussels") are all rare, imperiled mussels that live in freshwater rivers and streams in Central Texas.  Recognizing that water pollution, dams, and extreme weather events made more likely by climate change have put these species in danger of extinction, the U.S. Fish and Wildlife Service ("Service") recently listed the Texas Pimpleback, Guadalupe Orb, Texas Fatmucket, Guadalupe Fatmucket, False Spike and Balcones Spike as endangered and the Texas Fawnsfoot as threatened under the Endangered Species Act ("ESA"). *Endangered and Threatened Wildlife and Plants; Endangered Species Status With Critical Habitat for Guadalupe Fatmucket, Texas Fatmucket, Guadalupe Orb, Texas Pimpleback, Balcones Spike, and False Spike, and Threatened Species Status With Section 4(d) Rule and Critical Habitat for Texas Fawnsfoot*, 89 Fed. Reg. 48034 (June 4, 2024). The Service also designated 1,577.5 miles of rivers and creeks in the Brazos, Colorado and Guadalupe river basins as critical habitat for the mussels. *Id.*

Plaintiff seeks to set aside the listing rule and eliminate federal ESA protection for the Central Texas Mussels. Moreover, Plaintiff raises issues that could affect how the Service evaluates other species for listing and protection. The Center has a longstanding interest in the ESA listing process and regularly petitions the Service to protect imperiled species. A ruling for Plaintiff would harm the interests of the Center's members and erase years of work by the Center to protect the Central Texas Mussels and their habitat.

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*                    1

The Center does not believe that the government will adequately represent its interests in this case. The government necessarily represents a broader range of stakeholders, and the current administration, which oversees the Service, has repeatedly signaled through public statements and executive orders, see *infra*, that its interests are adverse to those of the Center regarding the federal protection of endangered species and implementation of the ESA. Accordingly, this Court should grant the Center's motion to defend its substantial interests in this case.

## BACKGROUND

I.      **The Imperiled Central Texas Mussels**

Freshwater mussels are filter-feeding bivalves that inhabit freshwater rivers and streams, and they are critical to the health of these ecosystems. They stabilize streams and prevent erosion by partly burying themselves into the stream bed, locking in sediment. They are a food source for wildlife like otters, muskrats, birds, and racoons. Perhaps most importantly, mussels act as sentinels of freshwater both because they clean the water and alert us when something is wrong with it. Mussels are sometimes called the "liver of the river" because they filter water and reduce turbidity by removing algae, sediment, and other harmful substances. Mussels can even filter out pharmaceuticals, personal care products, herbicides, flame retardants, *E. coli*, and avian influenza.[1] In fact, a single mussel can pump and filter between eight and fifteen gallons of water per day.[2]

---

[1] Caryn C. Vaughn, *Ecosystem services provided by freshwater mussels*, 810 Hydrobiologia 15 (2018), https://www.carynvaughn.com/wp-content/uploads/2021/02/Vaughn.Hydrobiologia.2018.pdf.
[2] Anna Šverclová and U.S. Fish and Wildlife Service, *Mussels: The Muscles of a Healthy Waterway* (April 25, 2024), https://www.fws.gov/story/2024-04/mussels-muscles-healthy-waterway.

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*        2

Constantly filtering out these harmful substances can be detrimental to the mussels. When water quality deteriorates, mussels often provide the first warning of a problem when they die off and wash onto shore.[3] Currently, freshwater mussels are the most endangered group of organisms in the United States.

Texas is home to more than 50 species of native freshwater mussels. Among these are the Texas Fatmucket, Guadalupe Fatmucket, Texas Pimpleback, Guadalupe Orb, False Spike, Balcones Spike, and the Texas Fawnsfoot, which are at the center of this lawsuit.

### A. Texas Fatmucket

The Texas Fatmucket is a rare mussel with a yellow, green, and tan shell. 89 Fed. Reg. 48043. It is endemic to Texas and lives in firm mud, stable sand, or gravel bottoms of free-flowing rivers. 89 Fed. Reg. 48044. There are five populations of this mussel, which survive only in the upper reaches of major tributaries of the Colorado River Basin: lower Elm Creek, upper/middle San Saba River, Llano River, Pedernales River, and Onion Creek. 89 Fed. Reg. 48044.

### B. Guadalupe Fatmucket

The Guadalupe Fatmucket is a small mussel with a yellow, green, and tan shell that may live as long as 25 years. 89 Fed. Reg. 48043. It was only recently discovered to be a species distinct from the Texas Fatmucket, and it survives only in a single population in the Guadalupe River, including the river's North Fork and Johnson Creek. 89 Fed. Reg. 48043.

### C. Texas Pimpleback

The Texas Pimpleback is a small- to medium-sized mussel with a yellow, brown, or black shell with green rays. 89 Fed. Reg. 48045. It may live as long as 72 years. 89 Fed. Reg. 48045.

---

[3] *Id.*

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*            3

While the Texas Pimpleback currently survives in five isolated populations in the Concho River, Upper San Saba River, Lower San Saba River/Colorado River, Llano River, and the Lower Colorado River, only two of those populations – the Lower San Saba and the Llano Rivers – are reproducing. 89 Fed. Reg. 48045. Historically, it lived throughout the Colorado River Basin. 89 Fed. Reg. 48046.

### D. Guadalupe Orb

The Guadalupe Orb is a small mussel that survives only in two populations in the Guadalupe River Basin that are isolated from one another. 89 Fed. Reg. 48045. It was discovered in 2018 that the Guadalupe Orb is a distinct species. 89 Fed. Reg. 48045.

### E. False Spike

The False Spike is a medium-sized mussel that is native to the Guadalupe Basin in central Texas. 89 Fed. Reg. 48047. The False Spike used to be common; however, it became increasingly rare and, by the 1970s, it was thought to be extinct. 89 Fed. Reg. 48047. Then, in 2011, seven live individuals were found. 89 Fed. Reg. 48047. Currently, there is only one known population of the False Spike mussel, but it has been extirpated from the remainder of its historical range. 89 Fed. Reg. 48047.

### F. Balcones Spike

The Balcones Spike is a small to medium-sized mussel with a yellow-green to brown shell with greenish rays. 89 Fed. Reg. 48046. Even though it was only described as a species in 2020, it is already rare. 89 Fed. Reg. 48046. There are currently only three populations of the Balcones Spike in the Little River and Llanos Rover. 89 Fed. Reg. 48046.

### G. Texas Fawnsfoot

Texas Fawnsfoot mussels live in free-flowing rivers and streams with mud, sand, or gravel bottoms. 89 Fed. Reg. 48044. There are only seven known populations of the Texas Fawnsfoot, which are found in the Clear Fork Brazos River, Upper Brazos River, Middle/Lower Brazos River, San Saba/Colorado Rivers, and Lower Colorado River. 89 Fed. Reg. 48044.

Several threats are driving the Central Texas Mussels towards extinction. Streambank erosion from development, agriculture, grazing, in-channel disturbances, and roads are increasing fine sediments, like clay and silt, which are smothering mussel beds. 89 Fed. Reg. 48049-50. Urbanization and contamination caused by hazardous spills, industrial wastewater, municipal effluents, and agricultural runoff are degrading water quality. 89 Fed. Reg. 48050-51. Inundation from dams and reservoirs replaces free-flowing water with lake-like environments, where the mussels cannot survive or reproduce. 89 Fed. Reg. 48051. Extreme changes in water levels can cause mussel beds to dry out (during low flows) or scour river and stream beds (during high flows). 89 Fed. Reg. 48052. Droughts and other low-flow events expose mussels to increased predation. 89 Fed. Reg. 48053. Because mussels disperse through rivers and streams by attaching to fish, barriers to fish movement (like dams and reservoirs) prevent mussel populations from growing or recolonizing areas where they have died out. All of these threats are exacerbated by climate change. 49 Fed. Reg. 48054.

## II.    The Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Fifty years later, the ESA remains "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

For terrestrial and freshwater species, the Secretary of the Interior ("Secretary"), acting through the Service, must determine whether any species is "endangered" or "threatened." 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 402.01(b) (2025). A species is designated as "threatened" when it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20), and "endangered" when it is "in danger of extinction throughout all or a significant portion of its range," *id*. §1532(6). To ensure the timely protection of species at risk of extinction, Congress set forth a detailed process whereby interested persons may petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3). In response, the Service must publish a series of three decisions according to statutory deadlines. First, within 90 days of receipt of a listing petition, the Service must, "to the maximum extent practicable," publish an initial finding as to whether the petition, "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). This is known as the "90-day finding." If the Service determines in the 90-day finding that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected, and the process concludes.

If the Service determines that a petition presents substantial information indicating that listing "may be warranted," the agency must publish that finding and proceed with a scientific review of the species' status, known as a "status review." *Id.* Upon completing the status review, and within 12 months of receiving the petition, the Service must publish a "12-month finding" with one of three listing determinations: (1) listing is "warranted"; (2) listing is "not warranted";

or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met. *Id.* § 1533(b)(3)(B).

If the Service determines that listing is "warranted," the agency must publish that finding in the Federal Register along with the text of a proposed regulation to list the species as endangered or threatened and take public comments on the proposed listing rule. *Id.* § 1533(b)(3)(B)(ii). Within one year of publication of the proposed listing rule, the Service must publish in the Federal Register the final rule implementing its determination to list the species. *Id.* § 1533(b)(6)(A). This is known as a "final listing rule."

To make a listing decision, the Service evaluates five statutory factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1). The Service must make timely listing determinations "*solely* on the basis of the best available scientific and commercial information regarding a species' status." 50 C.F.R. § 424.11(b) (2025) (emphasis in original); *see also* 16 U.S.C. § 1533(b)(1)(A).

The protections of the ESA apply only after a species is listed. These protections generally include the prohibition on "take" of individual members of endangered species, *id.* § 1538, designation of "critical habitat," *id.* § 1533(a)(3)(A)(i), and a requirement that federal agencies consult with the Service to "insure that any action authorized, funded, or carried out by [federal agencies] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [its critical habitat],"

*id.* § 1536(a)(2). To "take" a listed species is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, "or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" in this definition of take "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2025); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696–708 (1995) (upholding "harm" definition to include significant habitat degradation). For species listed as threatened rather than endangered, the Service can elect to either apply the Section 9 prohibitions or adopt a species-specific 4(d) Rule containing protective regulations that are "necessary and advisable . . . for the conservation of such species." 16 U.S.C. § 1533(d).

The ESA's protections are not absolute. The Service may issue permits to take listed species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Incidental take permits are issued through the Section 7 consultation process for activities that have a federal nexus, *see* 16 U.S.C. § 1536, and through the Section 10 habitat conservation planning process for activities on private lands. 16 U.S.C. § 1539. The Service may issue an incidental take permit if it finds that the applicant will minimize and mitigate the impacts of the incidental take "to the maximum extent practicable"; that there is adequate funding for the habitat conservation plan; and that the taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B)(iv).

## III.    The Decades-Long Fight to Protect the Mussels

Work to protect the Central Texas Mussels and the freshwater on which they depend began almost two decades ago. On June 27, 2007, the Service received a petition to list the Texas

Fatmucket. On October 15, 2008, the Service received an additional petition to list the Texas Pimpleback, Texas Fawnsfoot, and False Spike. On December 15, 2009, the Service published a 90-day finding that the petitions for these mussels presented "substantial scientific or commercial information indicating that the petitioned action may be warranted." 74 Fed. Reg. 66260 (Dec. 15, 2009). On October 6, 2011, the Service published a 12-month finding that the Texas Fatmucket, Texas Fawnsfoot, and Texas Pimpleback warranted listing but were precluded by higher priority actions. 76 Fed. Reg. 62166 (Oct. 6, 2011). These species were added to the candidate list and subsequently reaffirmed in the Service's annual candidate reviews until 2019. 84 Fed. Reg. 54732 (Oct. 10, 2019).

In 2018, the Service recognized Guadalupe Orb as a separate species distinct from the Texas Pimpleback, and the Guadalupe Fatmucket was taxonomically split from the Texas Fatmucket. 86 Fed. Reg. 47916 (Aug. 26, 2021). Similarly in 2020, the Balcones Spike was taxonomically split from the False Spike. 89 Fed. Reg. 48046.

In April 2021, the Center filed a lawsuit against the Service for its failure to make any listing determination for the Texas Fatmucket, Texas Pimpleback, and Texas Fawnsfoot. *Center for Biological Diversity v. U.S. Fish and Wildlife Service et al.,* Case No. 1:21-cv-00884 (D.D.C. Apr. 1, 2021) . The lawsuit catalyzed the Service to make the overdue listing decisions on each of the mussels. On August 26, 2021, the Service published a 12-month finding proposing to list the Guadalupe Fatmucket, Texas Fatmucket, Guadalupe Orb, Texas Pimpleback, and False Spike as endangered species. 86 Fed. Reg. 47916. The Service also proposed to list the Texas Fawnsfoot as a threatened species. *Id.* All six mussels were proposed with critical habitat designations totaling 1,944 river miles. *Id.*

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*          9

The Service failed to finalize the rule. In June 2023, the Center again filed suit against the Service – this time to compel the Service to issue a final listing determination for the mussels. *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, Case No. 4:23-cv-00287-LCK (D. Ariz. June 22, 2023). In a stipulated settlement agreement, the Service agreed to make final listing determinations for the Central Texas mussels by May 2024.

Finally, on June 4, 2024, the Service issued its final listing rule. 89 Fed. Reg. 48034. The Texas Pimpleback, Guadalupe Orb, Texas Fatmucket, Guadalupe Fatmucket, False Spike and Balcones Spike[4] were listed as endangered. *Id.* The Service listed the Texas Fawnsfoot as threatened and issued a 4(d) Rule. The 4(d) Rule prohibits import and export, take, possession of unlawfully taken specimens, interstate or foreign commerce, and sale or offer for sale of the Texas Fawnsfoot; however, the Service also excepted from take activities involving channel restoration, streambank stabilization, soil and water conservation, and surveying. *Id.* at 48065-66. The Service also designated 1,577.5 miles of rivers and creeks in the Brazos, Colorado and Guadalupe river basins as critical habitat for the mussels (retracting 364 river miles from its proposed designation). *Id.*

## IV.    This Lawsuit

Plaintiff, the State of Texas, challenges the listing of the Central Texas Mussels and the designation of critical habitat. With respect to listing, Plaintiff alleges that the Service's Final Rule violates the ESA by failing to consider voluntary conservation efforts. Compl. ¶ 3. Plaintiff also alleges the Service's take provisions for the mussels are overly vague in violation of Service policy. Compl. ¶ 3-4. It contends that the Service's final listing rule is procedurally deficient

---

[4] The Balcones Spike was taxonomically split from the False Spike after the issuance of the proposed listing rule.

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*          10

because it was published outside of the ESA deadlines. Compl. ¶ 3. Plaintiff also asserts that the Service was required to perform a National Environmental Policy Act (NEPA) analysis for the 4(d) Rule applicable to the Texas Fawnsfoot.

Regarding the critical habitat designation, Plaintiff asserts that the final rule failed to consider the best scientific data and commercial data, was untimely, and did not allow for adequate notice and comment on the regulatory definition of "habitat." Compl. ¶ 5.

## V.      Proposed Intervenor, Center for Biological Diversity

The Center is a national nonprofit environmental organization that works through science, law, and media to protect imperiled species and their habitats. Curry Decl. ¶ 4. The Center is headquartered in Tucson, Arizona with offices across the country. *Id*. The Center has 93,927 members, including 3,517 members in Texas, and 1.8 million online supporters nationwide dedicated to the protection of species hovering on the brink of extinction, including the Central Texas Mussels. *Id*. The Center has direct and legally protectible interests in this case.

The Center and its members have recreational, aesthetic, scientific, conservation, and economic interests related to the Central Texas Mussels and their habitat. *See generally* Declaration of Juliet Whitsett, **Exhibit 1** ("Whitsett Decl."), and Declaration of Tierra Curry, **Exhibit 2** ("Curry Decl."). The Center has worked for years to achieve federal ESA protection for the Central Texas Mussels. Curry Decl. ¶¶16-20. Now that they are finally listed and their habitat is protected, the Center and its members have an equally strong interest in seeing the Central Texas Mussels continue to receive the protection needed for their recovery. Curry Decl. ¶22. The Center and its members' interests would be harmed if the Service's listing was invalidated. Whitsett Decl. ¶14-15, 17, Curry Dec. ¶¶20-25.

## ARGUMENT

**I.      The Center is entitled to intervene as of right.**

The Center is entitled to intervene as of right because (1) the motion to intervene is timely, (2) the Center has an interest in the action's subject matter, (3) the disposition of this matter may impair or impede upon the Center's interests, and (4) the existing parties do not adequately represent the Center's interests. Fed. R. Civ. P. 24(a)(2); *see also Aransas Project v. Shaw*, 404 F. App'x 937, 940 (5th Cir. 2010) (citations omitted). Rule 24 is to be liberally construed. *La Union del Pueblo Entero v. Abbott,* 29 F.4th 299, 305 (5th Cir. 2022). Intervention is typically granted where "no one would be hurt and the greater justice could be attained." *Id*. Because the Center satisfies all requirements for intervention of right, and this Circuit's precedent generally favors intervention, the Court should grant the motion.

**A.  The Center's Motion to Intervene is timely.**

The Center's motion to intervene is timely because the litigation remains at an early stage and this Court has yet to issue any substantive rulings. When evaluating the timeliness of intervention, the Court considers:

> (1) how long the potential intervener knew or reasonably should have known of her stake in the case into which she seeks to intervene; (2) the prejudice, if any, the existing parties may suffer because the potential intervener failed to intervene when she knew or reasonably should have known of her stake in that case; (3) the prejudice, if any, the potential intervener may suffer if the court does not let her intervene; and (4) any unusual circumstances that weigh in favor of or against a finding of timeliness.

*Doe No. 1 v. Glickman*, 256 F.3d 371, 376 (5th Cir. 2001) (citations omitted). "The timeliness inquiry is contextual" and "is not limited to chronological considerations but is to be determined from all the circumstances." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (internal quotation marks and citations omitted). The timeliness inquiry

is "concerned only with the prejudice caused by the applicants' delay, not that prejudice which may result if intervention is allowed." *Edwards v. City of Houston*, 78 F.3d 983, 1002 (5th Cir. 1996) (citations omitted); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2022 U.S. Dist. LEXIS 59549, at *12 (N.D. Tex. Mar. 31, 2022).

The Center is submitting this Motion to Intervene at an early stage of the litigation soon after concluding that its interests may be negatively affected by the case. Under the Court's recent April 2, 2025 Scheduling Order, additional parties can be joined until August 15, 2025, the Administrative Record will not be lodged until September 22, 2025, and briefing is not scheduled to begin until December 5, 2025, assuming no motions related to the record. ECF No. 12. The Center does not seek to alter any deadlines set by the current Scheduling Order, so no delay would result from its intervention. Moreover, at this early stage before the administrative record, notices of joinder, or dispositive motions have been filed, intervention would not prejudice any party. *See, e.g., Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318 (5th Cir. 1986) (finding motion to intervene timely where five months passed between interest learned and intervention). Rather, the Center will suffer prejudice should this Court deny intervention, rendering it unable to participate as a party in support of the ESA listing or to appeal any adverse decision that might be issued in this case.[5]

Furthermore, there are no "unusual circumstances" that would weigh against the determination that the Center's application is timely. To the contrary, as discussed further below, the Center considers the current administration's unprecedented environmental regulatory actions, including those targeting the ESA, since assuming office to be "unusual circumstances" that support intervention at this time. *See, e.g.,* Secretarial Order 3418 (Directing Assistant

---

[5] *See e.g., Am. Stewards of Liberty v. DOI*, 960 F.3d 223, 228 (5th Cir. 2020).

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*          13

Secretaries to "suspend, revise, or rescind" regulations including three ESA implementing regulations). For all these reasons, the Center's motion is timely.

> **B.  The Center has a substantial interest in the continued protection of the Central Texas Mussels.**

The Center also satisfies Rule 24(a)'s "interest" requirement because it has a direct stake in the continued protection of the Central Texas Mussels under the ESA, which is "the basis of the controversy in the case." *Glickman*, 256 F.3d at 375 (citations omitted). To intervene under Rule 24(a), a potential movant must show a "direct, substantial, [and] legally protectable" interest in the proceeding. *Texas v. United States*, 805 F.3d at 657 (citations omitted). This factor "may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group." *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 U.S. Dist. LEXIS 163872, at *9 (W.D. La. Sep. 14, 2023) (citing *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014)). This is because "the zone of interests protected by a constitutional provision or statute of general application is arguably broader than are the protectable interests recognized in other contexts." *All. for Hippocratic Med. v. United States FDA*, No. 2:22-CV-223-Z, 2024 U.S. Dist. LEXIS 57944, at *14 (N.D. Tex. Jan. 12, 2024) citing *Brumfield,* 749 F.3d at 344. Moreover, when the "property or transaction" of an action is a federal statute, "the legal question is whether the [intervenors] have an interest relating to" the statute. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2022 U.S. Dist. LEXIS 59549, at *17 (N.D. Tex. Mar. 31, 2022) (citing *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015)). While there is no "clear definition of the nature of the 'interest . . .' that is required for an intervention of right," *Wal-Mart Stores*, 834 F.3d at 566, the Fifth Circuit has held that "'public spirited' civic organizations that successfully petition for adoption of a law may intervene to vindicate their 'particular interest' in protecting that law." *Id.* at 567 (citations omitted).

The Center satisfies Rule 24(a)'s interest requirement because it is dedicated to conserving wildlife, including the Central Texas Mussels and the flowing freshwater rivers and streams on which they depend. As discussed *infra*, the Center spent years working to secure ESA protection of the Central Texas Mussels, participating in administrative rulemaking processes, and taking legal action when the ESA's mandatory deadlines lapsed. Curry Decl. ¶¶16-18. In addition to the Central Texas Mussels, the Center has a proven track record of advocating for protection of other species of mussels and their freshwater ecosystems throughout the United States. Curry Decl. ¶¶6-11. The Center's prolonged, diligent advocacy for the Central Texas Mussels establishes a "direct, substantial, and legally protectable" interest in this proceeding. *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) (reversing the district court's denial of intervention). Plaintiff seeks to overturn the very same protections the Center has spent time and resources working to attain. Thus, the Center's interests are sufficiently related to the "transaction that forms the basis of the controversy in the case" to support intervention as of right. *Glickman*, 256 F.3d at 375.

The Center also satisfies the interest requirement here because its members have recreational, aesthetic, scientific, conservation, and economic interests in the Central Texas Mussels. Center member, Juliet Whitsett, is an artist and environmental educator who lives in central Texas. Whitsett Decl. ¶¶1-5. She has created art and educational projects specifically about the Central Texas Mussels. Whitsett Decl. ¶¶1-5. Ms. Whitsett spends time recreating in and around the mussels' habitat, including swimming, paddling, tubing, camping, and hiking. Whitsett Decl. ¶11. She enjoys and looks forward to seeing and experiencing the Central Texas Mussels in the wild. Whitsett Decl. ¶11. The loss of the Central Texas Mussels would harm the recreational, aesthetic, scientific, conservation, and economic interests of Ms. Whitsett and other

Center members. *See generally* Whitsett Decl.; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) (recognizing that "the desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing").

### C. An adverse ruling would harm the Center's interests.

The Center's interests in the protection of the Central Texas Mussels and their critical habitat will be impaired if Plaintiff succeeds in this lawsuit. In determining whether as a practical matter "the disposition of the case may impair or impede [the Center's] ability to protect [its] interest[s]," *Glickman*, 256 F.3d at 375 (citations omitted), the Court must consider the "totality of the circumstances." *Tot Power Control, S.L. v. AT&T Mobility LLC*, No. 6:21-CV-00107, 2021 U.S. Dist. LEXIS 195476, at *5 (W.D. Tex. Oct. 8, 2021) (citing *Edwards,* 78 F.3d at 1000).

A ruling for Plaintiff in this case would cause significant harm to the Center's interest in maintaining protection for the Central Texas Mussels and the rivers and streams that have been designated as their critical habitat. Plaintiff seeks to vacate the listing of the species under the ESA, which would eliminate critical legal protections for the Central Texas Mussels and the last places where they survive, directly impairing the Center's and its members' recreational, aesthetic, conservation, economic, and other interests in the mussels, as well as the Center's ability to protect those interests. *See supra*, Section I.B. In addition, a ruling for Plaintiff would undermine years of advocacy and legal work by the Center to protect the Central Texas Mussels and their habitat. It would also eliminate the Center's most powerful legal tool to protect the species—the ESA—at a time when the Central Texas Mussel populations are imperiled and declining water quality, pollution, sediment, dams and development, droughts, and violent floods continue to degrade their habitat. There is a substantial risk that reversal of the ESA protection

for the Central Texas Mussels would cause the permanent and irreversible loss of these species. Thus, this litigation, "may, as a practical matter, impair or impede [the Center's] ability to protect [its] interest[s]." *Ross v. Marshall*, 426 F.3d 745, 760 (5th Cir. 2005) (quoting *Espy*, 18 F.3d at 1207).

### D.  Federal Defendants do not adequately represent the Center's interests.

Having demonstrated that the Center has a legally protectable interest in the Central Texas Mussels and that disposition of this action may impair or impede that interest, the Center has a right to intervene in this action "unless existing parties adequately represent that interest." Fed. R. Civ. Proc. 24 (a)(2); *Glickman*, 256 F.3d at 375. Intervenors need only show that the current parties' representation "'*may* be' inadequate; and the burden for making that showing should be treated as *minimal*." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added; citation omitted).

In the Fifth Circuit, there are two presumptions of adequate representation that a potential intervenor of right must overcome to make this minimal showing. *Louisiana v. Burgum*, 132 F.4th 918 (5th Cir. 2025). When a potential intervenor "has the same ultimate objective as a party to the lawsuit," the intervenor can overcome the presumption of adequate representation by showing "adversity of interest, collusion, or nonfeasance on the part of the existing party." *Id.* A movant shows "adversity of interest" by showing its interests "diverge from the putative representative's interests in a manner germane to the case." *Id.* A second presumption arises when the existing party is a governmental body or officer charged by law with representing the interests of the movant, which can be overcome by showing that the intervenor's interest is in fact different from that of the governmental party and that the interest will not be represented by the existing governmental party." *Id.*

Even if the Center and the Federal Defendants were to share the same "ultimate objective" in the lawsuit—which is by no means certain here—the Center overcomes the presumption of adequate representation because its interests diverge from the Federal Defendants' interests in a manner germane to the case and its interests will not be represented by them. This is amply demonstrated both by the Service's prior delays in protecting the mussels as well as the current administration's position adverse to endangered species protection that has been espoused in its recent orders and policies.

The Federal Defendants have historically opposed the Center's interests in the Central Texas Mussels' timely and effective protection. As described above, it took almost two decades and multiple rounds of litigation filed by the Center to compel the Service to act on these species. In species protection cases, even where Federal Defendants and the Center are aligned on the ultimate outcome, the government rarely has the same objectives as the Center because it must balance multiple interests and stakeholders.

The risk of diverging interests is even greater in this case because the current administration has taken numerous actions demonstrating that its priorities are not aligned with the Center's on saving endangered species or protecting their habitat. Significantly, on May 7, 2025, in another listing challenge by the State of Texas, the Service changed its position on the Final Listing Rule of the Lesser Prairie Chicken under the ESA, 87 Fed. Reg. 72674 (Nov. 25, 2022), and moved for voluntary vacatur of that rule. *State of Texas, et al. v. Dep't of the Interior, et al.,* Case No. 7:23-cv-00047-DC (W.D.Tex. May 7, 2025).

Additionally, the current administration has issued multiple executive orders, made public statements, and voiced support for legislation that rolls back environmental protections, including protections under the ESA.  On President Trump's first day in office,  he issued in an

executive order declaring a "National Energy Emergency" in order to make it easier to bypass ESA protections and directed the federal agencies to "identify obstacles to domestic energy infrastructure specifically deriving from implementation of the ESA or the Marine Mammal Protection Act, to include regulatory reform efforts, *species listings,* and other related matters with the aim of developing procedural, regulatory, and interagency improvements."[6] In a separate executive order entitled "Unleashing American Energy," the President called on all federal agencies to "suspend, revise, or rescind" actions that are "unduly burdensome" to energy exploration and development.[7]

Other executive orders issued by the President direct agencies to use their emergency powers to avoid ESA responsibilities and invoke the "God Squad," a committee empowered to consign species to extinction by finding ways to eliminate their protection in favor of extractive industries.[8, 9] Another order directs agencies to establish a "sunset rule" for all new and existing regulations under the ESA, among many other laws, in an attempt to boost the fossil fuel industry.[10]

---

[6] Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 29, 2025) (emphasis added), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

[7] Exec. Order No. 14,154, 90 Fed. Reg. 8358 (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/.

[8] Exec. Order No. 14,225, 90 Fed. Reg. 11,365 (March 1, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/immediate-expansion-of-american-timber-production/.

[9] Exec. Order No. 14,223, 90 Fed. Reg. 11,359 (March 1, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-the-threat-to-national-security-from-imports-of-timber-lumber/.

[10] Exec. Order No. 14,270, 90 Fed. Reg. 15,643 (April 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/zero-based-regulatory-budgeting-to-unleash-american-energy/.

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*                19

On April 17, 2025, the administration proposed a rule that proposes to eliminate the long-standing definition of "harm" under the ESA, undermining core protections for endangered wildlife such as the species at issue here. The rule would rescind the definition of "harm" under the regulations of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, effecting a monumental change in the way those agencies administer and enforce species' protections. The proposed rule would remove habitat destruction from the list of prohibited actions under the law, making it easier to pollute and degrade critical ecosystems. Since pollution and habitat destruction are the primary threats to the Central Texas Mussels, this action is directly contrary to any efforts to conserve them.

While, to the Center's knowledge, the current administration has not yet made specific comments about the Central Texas Mussels, its deviation from the Center's interests insofar as protecting imperiled species and implementing the ESA are concerned is abundantly clear.  As further evidence, Interior Secretary Doug Burgum, who also oversees the Service, has carried out administration policy by issuing two secretarial orders that aim to boost fossil fuel extraction over endangered species protections.[11] Brian Nesvik, who has been nominated to be the director of the Service, has been publicly outspoken against implementation of the ESA in its current form. In 2020, Nesvik joined the Wyoming Stock Growers Association in stating that the ESA "must be pruned." In 2021, Nesvik vocally opposed efforts to protect and conserve sage grouse populations from threats to their habitat from the oil and gas industry.[12]

---

[11] U.S. DOI, *Secretary Doug Burgum Signs First Round of Secretary's Orders to Unleash American Energy* (Feb. 3, 2025), https://www.doi.gov/pressreleases/secretary-doug-burgum-signs-first-round-secretarys-orders-unleash-american-energy.

[12] Brian Nesvik, *Presidential suspension on mineral development bad for Wyoming's wildlife* (Feb. 10, 2021), https://wgfd.wyo.gov/News/Presidential-suspension-on-mineral-development-bad,.

*Center for Biological Diversity Memorandum in Support of Motion to Intervene*          20

In far less politically-charged circumstances than this, courts have recognized that government agencies do not adequately represent private parties. *See Trbovich*, 404 U.S. at 538–39 (interests of government and private intervenor were not "identical" because the government "has an obligation to protect" a broader "public interest" than the interests private intervenor sought to vindicate); *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1254–56 (10th Cir. 2001) ("In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor."); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259–60 (11th Cir. 2002) ("We do not believe that a federal defendant with a primary interest in the management of a resource has interests identical to those of an entity with economic interests in the use of that resource.").

Given the stark divide between the Center and Federal Defendants on matters of ESA policy, and the not insignificant risk of settlement or reversal of position consonant with the administration's actions to date, there is an "adversity of interest" between the Center and the Federal Defendants. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,* No. 5:21-CV-071-H, 2022 U.S. Dist. LEXIS 59549, at *19 (N.D. Tex. Mar. 31, 2022) (citing *Edwards v. City of Houston,* 78 F.3d 983, 1005 (5th Cir. 1996)). In this circuit, an intervenor "need not show that the representation by existing parties will be, for certain, inadequate" only that it "may" be so. *Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014) (quoting *Espy*, 18 F.3d at 1207). Here, the Center overcomes the presumption of adequate representation because its interests diverge from the Federal Defendants' interests in a manner germane to the case. *Entergy Gulf States La. L.L.C. v. U.S. Env't Prot. Agency*, 817 F.3d 198, 203 (5th Cir. 2016) (permitting the Sierra Club to intervene in a Freedom of Information Act lawsuit where their interests and strategy diverged

from EPA's); *Texas v. United States*, 805 F.3d at 662 (permitting "Jane Does" to intervene even where they shared a common objective in upholding the law at issue in the case). For these reasons, the Center has been granted intervention in prior ESA listing cases including before courts in this Circuit. *Am. Stewards of Liberty v. DOI*, 370 F. Supp. 3d 711 (W.D. Tex. 2019) (conservation groups intervention granted to defend listing of the bone cave harvestman); *Louisiana v. Haaland,* No. 2:23-CV-01157, 2023 U.S. Dist. LEXIS 163872, at *14 (W.D. La. Sep. 14, 2023); *see also Colosi v. Charlotte County, Fla*., No. 24-cv-1004 (M.D. Fla. filed Oct. 29, 2024) (conservation groups intervention granted to defend listing of the Florida scrub jay). This Court should grant the Center's Motion for Intervention as of right.

## II.    Alternatively, the Court should grant permissive intervention.

Alternatively, the Center moves for permissive intervention under Rule 24(b). Permissive intervention "is appropriate when: (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *Endurance Am. Ins. Co. v. Lloyd's Syndicate 3624*, No. 3:23-CV-0133, 2023 U.S. Dist. LEXIS 75051, at *3-4 (N.D. Tex. Apr. 28, 2023) (quoting *DeOtte v. Azar*, 332 F.R.D. 173, 178 (N.D. Tex. 2019)). Permissive intervention "is wholly discretionary." *Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 812 (W.D. Tex. 2022) (citation omitted). As shown above, the Center's motion is timely and will not cause delay or prejudice any party.

The existing questions of law and fact are the same questions that the Center seeks to litigate in this action. *See Berkley Nat'l Ins. Co. v. Ramos,* No. 5:23-CV-005-H, 2023 U.S. Dist. LEXIS 243765, at *11 (N.D. Tex. June 29, 2023). The Center seeks to present defenses relevant to this case's central issue: the legality of the Service's listing and protection of the Central

Texas Mussels and the designation of their critical habitat under the ESA. Moreover, the Center's perspectives on the implementation of the ESA and the value of biodiversity conservation often differ from Federal Defendants' and will assist with resolution of this case. Permitting the intervention of the Center will aid in this Court's adjudication of important questions of law in defense against Plaintiffs' claims, including, *inter alia,* whether hard-fought and much-needed protections under the ESA are lost simply because chronically underfunded agencies are unable to meet their deadlines (*see* Compl. ¶ 3, 5) and whether the Administrative Procedure Act requires additional notice and comment when regulatory definitions are revised (*see* Compl. ¶5). The disposition of these questions will impact ESA protection – and the Center's work – nationwide, putting the Center in a unique position in defending these claims.

Permissive intervention is also warranted because the Center will contribute to the factual development of a key issue in this case: the adequacy of voluntary conservation measures for the Central Texas Mussels. As described above, Center has spent considerable time and resources evaluating, commenting on, and monitoring the effectiveness of these types of voluntary agreements, and has long disagreed with governmental parties on issues related to their implementation and effectiveness.

Courts recognize that permissive intervention may be warranted where, as here, prospective intervenors will contribute to the development of factual issues underlying a case. *See Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (intervenor applicant's capacity to "significantly contribute to full development" of factual issues may be grounds for permissive intervention); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 472 (5th Cir. 1984) (same); *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 103 (D. Conn. 2007) (granting permissive intervention to a non-profit organization in part

due to its "highly relevant factual perspective"). The Center has made a timely Motion to Intervene and has defenses that share common questions of law and fact with the main action. Fed. R. Civ. Proc. 24(b). Accordingly, permissive intervention under Rule 24(b) is warranted.

**III.     The Center has standing to pursue different relief from the existing parties.**

Because the Center does not raise a counterclaim, cross-claim, or any other claim for relief, it does need not show standing to successfully intervene. *Franciscan All. Inc. v. Azar,* 414 F. Supp. 3d 928, 938 (N.D. Tex. 2019). However, to the extent standing will be at issue later in this case (*e.g.,* to the extent the Center seeks different relief on appeal), the Center satisfies Article III's requirements for associational standing. An association has standing to bring claims on behalf of its members when it meets three requirements: (1) its individual members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation. *NetChoice, L.L.C. v. Fitch*, No. 24-60341,  134 F.4th 799, 2025 U.S. App. LEXIS 9167, at *5 (5th Cir. Apr. 17, 2025). The Center's declarations in this case show that the Center and its members have aesthetic, recreational, scientific, and professional interests in the protection of the Central Texas Mussels which would be harmed by the loss of their ESA protection in this case and redressable by a decision upholding the mussels' listing and habitat designation. *See* Whitsett Decl. ¶18.  Protection of the mussels is germane to the Center's work to preserve the Central Texas Mussels and other endangered species. Curry Decl. ¶¶23-24. Any relief sought in this case will not require the individual participation of Ms. Whitsett or another individual Center member.

## CONCLUSION

For the reasons set forth above the Center respectfully requests that this Court grant their motion to intervene as of right or, in the alternative, for permissive intervention.

DATED:  May 23, 2025                    Respectfully submitted,

 /s/ Lindsay E. Reeves
Lindsay E. Reeves (La. Bar No. 32703)*
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Phone: (504) 342-4337
lreeves@biologicaldiversity.org

Brian Segee (Cal. Bar No. 200795)*
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: (805) 750-8852
bsegee@biologicaldiversity.org

Jon Mark Hogg (Tex. Bar No. 00784286)
JON MARK HOGG PLLC.
421 W. Concho Ave.
San Angelo, Texas 76903
Phone: (325) 777-0455
jmh@jmhogglaw.com

*Seeking admission *pro hac vice*

*Attorneys for Center for Biological Diversity*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record. I provided copies of the proposed order via email to Wesley S. Williams, Clark C. Reeder, Claudia Gutierrez, and Elizabeth Kirby.

Dated: May 23, 2025                                  /s/ Lindsay E. Reeves
                                                     Lindsay E. Reeves

                                                     *Attorney for Center for Biological Diversity*